## Case No. 11,540.

RALSTON et al. v. The STATE RIGHTS.

[Crabbe, 22.] [1]

District Court, E. D. Pennsylvania. Sept. 5, 1836.

COLLISION—EXEMPLARY DAMAGES—BOTH IN FAULT—MALICIOUS ACTS OF CAPTAIN—SCOPE OF EMPLOYMENT.

1. If exemplary damages are claimed, in a case of collision, evidence may be given of acts prior to the collision.

2. But the evidence must be confined to acts prior to and at the time of the collision.

3. The rule that where both parties to a collision are in fault, the damage must be shared, only applies to cases where both are in fault at the time and in the acts which produced the collision, and where the faults are not egregiously unequal.

[Cited in The St. Paul, Case No. 12,243.]

4. In case of a wilful and malicious collision, damages may be given above the amount of actual injury.

[Cited in Lake Shore & M. S. Ry. Co. v. Prentice, 147 U. S. 109, 13 Sup. Ct. 263.]

5. Owners are liable for the wilful and malicious acts of a captain, done in the course and scope of his employment.

[Cited in Pendleton v. Kinsley, Case No. 10,- 922; The Florence, Id. 4,880; Taylor v. Brigham, Id. 13,781.]

[Quoted in Thompson v. Hermann (Wis.) 3 N. W. 583.]

6. Otherwise of crimes committed by a captain, not within the course and scope of his employment.

[Cited in Gabrielson v. Waydell, 135 N. Y. 8, 31 N. E. 970.]

This was a libel for damages. It appeared that the Linnæus [Mathew C. Ralston, Charles A. Davis, and Sidney Brooks, owners] and the State Rights [Joseph H. Allen, master] were running, in opposition, between Philadelphia, Burlington, Bristol, and Bordentown, on the river Delaware; that on the 6th and 30th of May, and on the 13th of June, 1836, the two boats came into collision; that the State Rights was much the stronger and more powerful boat; that the Linnæus was considerably injured; that the passengers on board of the Linnæus, on the 6th May, were much incensed by the conduct of the captain of the State Rights; and that they published a statement, in the newspapers of Philadelphia, severely censuring him. The libel was filed on the 27th June, 1836, and claimed ten thousand dollars damages.

On the 15th August, 1836, the case came on for a hearing before Judge HOPKINSON, and was argued by Mr. Chester and J. C. Biddle, for libellants, and by Mr. Norris and J. R. Ingersoll, for respondent.

The respondent's counsel having proposed, at the trial, to examine witnesses as to facts occurring at other times than on the date of the occurrences complained of, the counsel for the libellants objected.

HOPKINSON, District Judge, said: The libellants claim, not only compensatory, but, exemplary damages; there can be no set-off

1 [Reported by William H. Crabbe, Esq.]

to the first, but the second is materially affected by it. This court is not only to try the issue of fact—that is, whether the injury complained of was done—but to assess the damages: that is, to perform the part of the jury, and also of the court. In basing our sentence we always hear attendant circumstances. The evidence is admitted, but must be confined to acts prior to the injuries complained of.

The evidence having been closed,—

Mr. Chester, for libellants, contended, after arguing the questions of fact, that the damages should be measured, not only by the actual injury sustained, but by the loss of time, custom, and profit, suffered on account of the collision; and that the owners were liable for the acts of their agent, the captain.

Mr. Norris, for respondent. The owners are not liable for the wilful torts of their agent. Both parties being in fault, the damage should be shared. Jac. Sea Laws, 328.

Mr. Ingersoll, on the same side. In case of collision, there can be no recovery beyond the actual damage sustained. Jac. Sea Laws, 328. Exemplary damages are out of the question. Owners are not responsible for a wilful wrong or trespass done by their agent or captain, out of the course and scope of his employment. Bussy v. Donaldson, 4 Dall. [4 U. S.] 206; Jones v. Hart, 2 Salk. 441; The Shepherdess, 5 C. Rob. Adm. 264; Bowcher v. Noidstrom, 1 Taunt. 568; Dias v. The Revenge [Case No. 3,877]; McManus v. Crickett, 1 East, 106. The acts complained of were not within the course and scope of the captain's employment; and the property of his employers should not be made liable for his wrongful acts. The libellants aver this to be a case of wilful and malicious wrong, and not one of negligence or unskilfulness, for which the owners would, undoubtedly, be liable.

Mr. Biddle, for libellants. This case is fully within the jurisdiction of the court. Serg. Const. Law, 207; 3 Story, Const. 533, and note; The Amiable Nancy, 3 Wheat. [16 U. S.] 558; Martin v. Hunter's Lessee, 1 Wheat. [14 U. S.] 335. The owners assented to and ratified the acts of their agent, by continuing him in their employ, after the publication concerning the first collision. There is no hardship in making the owners liable for the captain's misconduct; for, if he have exceeded his authority, he will be liable to them in damages.

All the counsel argued the questions of fact very fully.

HOPKINSON, District Judge. The steamboat State Rights was built by the Camden and Amboy Railroad Company, for the purpose of passing, with their passengers and freight, over the Delaware, between Philadelphia and Camden, when the river was ob-

structed with ice. To enable her to perform this service, she was armed with an "ice-breaker," and provided with an engine of extraordinary power for the size of the boat. When the navigation of the river was open, in the last spring, this boat was laid aside, and the company commenced running up the Delaware, with their three large passenger and freight boats, at various hours of the day. On the 2d of May, the Linnæus, a small steamboat, built for the transportation of passengers and freight, commenced running up the river as far as Bordentown, stopping at the usual intermediate places, and starting, at both ends of her route, at an hour different from any of the boats of the company. The price of a passage to Bordentown, Bristol, or Burlington, on board of the company's boats was fifty cents; the charge of the Linnæus to the same points, was twenty-five cents. Two or three days after the Linnæus began to run, the company drew the State Rights from her retirement, and put her on the same route, and at the same hours of starting, with the Linnæus, carrying passengers to the places mentioned for twelve and a half cents. It cannot be believed that this was done with any view to profit from this boat; on the contrary, the expense of running her could not be defrayed by such a fare. She must have been run at a considerable daily loss. It is, indeed, freely admitted by the counsel of the respondent, that the State Rights was set afloat for a competition with the Linnæus, but that the competition was fair and lawful; and so it was, provided that it was fairly and lawfully conducted. This company, for the very purpose of putting down the competition, if it could be so called, which the Linnæus had entered into with their large and superior boats, so excellent in their accommodations, speed, and general management, had an undoubted legal right to run the State Rights, or any other boat, at twelve cents, or at one cent, a passenger. Yet I cannot but believe that it would be more worthy of their high character and overwhelming strength to imitate the generosity of the eagle who "suffers little birds to sing," rather than to pounce upon every unfortunate sparrow that might cross their path. Their right, however, was unquestionable, and it was for them to judge of the expediency of using it. It is equally certain that they were bound to exercise it without infringing upon the rights of others. Their power and influence might be exerted to draw the public patronage to themselves, but not, by violence and wrong, to drive off a competitor, however feeble. In such an attempt they would raise up another adversary, the law, as much too strong for them, as they might be for the humblest rival.

The question, then, in this case is, whether the owners of the State Rights, or their agents, in their competition with the Linnæus, have kept themselves within their legal rights, or have resorted to their superior strength to crush a rival by violence and wrong. This is the charge made by the libellants, and which they must prove and maintain by their evidence. It is my duty to examine and decide whether they have done so or no. The libel charges that the Linnæus was engaged in trading on the high seas, at, from, between, and to the ports of Philadelphia, Burlington, Bristol, and Bordentown, on the river Delaware, and carrying passengers and freight to and from the said ports. That on the 6th day of May last, while peaceably engaged on the high seas, between Bordentown and Philadelphia, about two and a half or three miles from Bordentown, she was run into by the State Rights—a steamboat of great strength and speed, armed with an ice-breaker—with great force and violence, by means whereof the Linnæus was struck just abaft the wheel on the starboard side, and received great damage. That the captain of the Linnæus, having stopped his engine, stated to the captain of the State Rights, that he had respectable ladies on board, that the river was open to him, and requested him to proceed on his way; that he waited some time for the State Rights to proceed, but, finding she would not, he again got under way, and had proceeded but a short distance, when the State Rights came down upon him with her whole force, and again struck the Linnæus, running square into her stern. The libel complains of another attack on the same day, while the boats were at Burlington. Another is complained of on the 30th of May, between Bordentown and Bristol; and another on the 13th of June, the circumstances of which are particularly set forth.

The answer of the respondent denies "that on either of the times mentioned in the libel, or any of them, the steamboat State Rights did run into or against the said boat Linnæus, as is stated in the said libel." The respondent also "avers that during the periods of time aforesaid, and while the said boat State Rights was employed as aforesaid, the said boat State Rights was run into and against by the said boat Linnæus several times, and, as respondent believes, intentionally and with a view of disabling her, and to prevent her continuing to navigate the said river, as by law she was entitled to do."

The replication denies that the Linnæus, at the times mentioned, or at any time, ran into or against the State Rights, with a view of disabling her, &c.

The matters of fact put in issue by these pleadings must be determined by the evidence given to the court concerning them, and the questions of law raised at the bar will then be considered. It will conduce to a better understanding of the case to consider separately the several aggressions complained of, in their order, and inquire whether, on the whole testimony, the libellants have maintained their plea and complaint for all.

or any of the alleged trespasses. We begin with the transactions of the 6th of May, which was but two or three days after the State Rights commenced running. The recurrence of the evidence of so many witnesses to the same transactions, and their repetitions of the same circumstances, cannot but be tedious; it is only by examining all the testimony, however, that a satisfactory result can be obtained.

The first witness, on the part of the libellants, is William Reeves, the captain of the Linnæus. Notwithstanding the relation in which he stands to the libellants, his testimony was given with a moderation and propriety that would acquit him of any intended misrepresentation or exaggeration of the occurrences of which he speaks, even if it should be found that he has fallen into some error in point of time. No imputation, however, has been made upon him in this respect. He says that his boat began to run on the 2d of May, and the State Rights two days after; that on the 6th, when coming down the river, just below Betty's Point, about two miles and a half from Bordentown, the State Rights ran into him, striking him, in the first place, just abaft the wheel, and breaking his guard; he stopped his engine, and told Captain Allen to go on, that the river was open to him, and that there were ladies on board the Linnæus. Captain Allen also stopped his engine for two minutes, and was floating down the river when the witness told him to go on, which he would not do. The witness then started, and got about an hundred yards ahead of him, when the other boat got under way, came after the Linnæus, and struck her full in the stern under the counter. The witness stopped again. Captain Allen stopped also, and laid still, until the Linnæus started, then came up in the same way, and broke and carried away part of the forward guard of the Linnæus. The witness says his passengers were so much enraged that they jumped on the rail, and were about to go on board the State Rights, with the intention of trying Captain Allen, and bringing him to town. The witness prevented this. The Linnæus proceeded down the river. The State Rights arrived at Burlington first, and stayed there long enough to take her passengers in. She then left the wharf with intention of going down the river. The Linnæus went to the wharf, when the State Rights came back and ran into the Linnæus at the wharf, split her stem and broke her cutwater. The witness says that he left Bordentown first; that there was room, at the time of the first collision, for half a dozen boats to pass him without coming into contact. The State Rights is much the faster boat. She was employed during the previous winter in breaking the ice between Camden and Philadelphia, and was armed with an ice-breaker for that purpose. She is a rough, strong boat, of great power. Two days after these occurrences, the Linnæus broke her air-pump beam, and was stopped four days. The State Rights stopped during the same time. This is the account given by Captain Reeves, of what took place on the 6th of May; he added, on his cross-examination, that the Linnæus was laid up twice between the 6th of May and the 13th of June, and that then the State Rights lay at Camden, and had her ice-breaker taken off.

Mendert Wilson was a passenger on board the Linnæus on the 6th of May, on her trip from Bordentown; he had gone up from Philadelphia on the State Rights. He thinks the State Rights left Bordentown first, but was going down slowly until the Linnæus was going by her. She then came in contact with the Linnæus. There were a number of ladies on board the Linnæus, who were much alarmed. After a while, the boats got started again; another attack was made, he believes at Burlington, but is not positive whether there was another before they reached there. At Burlington, he says, the State Rights was ahead. The Linnæus stopped in the river to give the State Rights room to come off; she at length left the wharf, and went into the channel, as if going down the river; the Linnæus then made up to the wharf; the State Rights returned and struck her in the bow. This is the evidence of Mr. Wilson, upon which I will remark that it appears to me he refers to what happened near the coal wharf of Bristol, at the head of Burlington Island, as detailed by the respondent's witnesses, and which seems to me to have been the first collision between the boats on the 6th of May, and of consequence, Captain Reeves has been in error in his account of the proceedings of that day, and confounded them with the occurrences of some other time, perhaps of the 30th of May. This will more clearly appear as we proceed with the evidence.

Edward Buckingham also went from Philadelphia to Bordentown, on the 6th of May, in the State Rights, and returned in the Linnæus. He speaks of the State Rights running foul of the Linnæus as she lay at the wharf at Bordentown, according to his recollection. That the State Rights lay a little above the Linnæus; that she took in her passengers and proceeded towards the Linnæus before she started, then drew back about an hundred feet and came at her a second time. The Linnæus took in her passengers and proceeded down the river; the State Rights ran foul of her athwart the bow; the Linnæus stopped her engine; the passengers asked what was the cause of the collision; the captain of the State Rights made no answer, but laughed. The passengers of the Linnæus were much enraged; they wanted Captain Reeves to draw up a writing; he did not seem willing to do it. They said the conduct of the captain of the State Rights ought to be made public. Mr. Wilson drew up the paper.

George Turner was on board the Linnæus

on the 6th of May. He speaks of none of the occurrences of that day until they arrived at Burlington. In crossing from Bristol to Burlington, he perceived the steamboat Burlington there at the wharf. The State Rights was before the Linnæus, and went and lay alongside of the Burlington. When Captain Reeves got near he stopped his boat; he then started, and beckoned to his passengers to go to the lower wharf, but perceiving that they had a good deal of marketing, he turned round to come to the wharf where the other boats lay. When the Linnæus got near the wharf, the Burlington and State Rights stood off; the Linnæus then went alongside of the wharf, and made fast. The State Rights came in and ran foul of the bow of the Linnæus. The State Rights appeared to rebound. and came against the Linnæus a second time. The engine of the State Rights was going. It seemed as if they wished to get a line ashore from the State Rights, and this was afterwards done. The passengers condemned the conduct of the State Rights very much.

This is the evidence of the libellants as to occurrences of the 6th of May. I am strengthened in my opinion that in the narrative of Captain Reeves, he has fallen into some error, by misplacing into that day events which took place at another time. None of the witnesses describe the collisions of that day as he has done, or speak of any at the place he has designated. The collision at the head of Burlington Island, near to the coal wharf, and about a mile from Bristol, and that which happened at the wharf of Burlington, seem to me to be all that took place on the 6th of May. As to the occurrences at Burlington wharf, I shall give my opinion after recurring to the testimony of the respondent.

Our knowledge of the events of the 6th of May is not much increased by the respondent's witnesses, particularly as to what happened prior to the arrival of the boats at Burlington. William Vandegrift and Lewis Craft may, and it is probable they do. refer to that day, although the first speaks of the "fore part of May," and the other of "about the first of May, or a little later." As, however, the answer of the respondent charges that the Linnæus did, at several times, run into the State Rights. which is denied by the replication. this evidence should be attended to whether it relates to the 6th of May. or any other day previous to the 13th of June. the date of the last aggression complained of in the libel. These witnesses, Vandegrift and Craft, testify that they were on shore. on the Jersey side of the river, one of them on the island, the other on the main land. Mr. Vandegrift saw the Linnæus with her bow in the State Rights, shoving her over towards the Jersey shore; that the State Rights was near running aground; that she then took a sheer and ran the Linnæus over to the Pennsylvania shore, where the Lin-

næus stopped her engine. Mr. Craft deposes that he saw the boats coming down the river, the State Rights being a little behind when he first saw them. As they passed the witness, the State Rights came alongside the Linnæus, or nearly so, the Linnæus then being on the Pennsylvania side, and, as the witness thought, heading rather across, to go to Burlington. The State Rights was going directly towards Burlington. The advantage of the tide was with the Linnæus until they got under Burlington Island, when the State Rights got the advantage and put the Linnæus across to the Pennsylvania shore. The collision arose from the one going down and the other across the river. It turned the State Rights out of the course she had been going. When they came in contact the Linnæus was near the Pennsylvania shore. The witness says explicitly that the State Rights might have passed the Linnæus without coming in contact with her; there was the whole breadth of the river for her.

The conclusion, in my understanding, from this testimony, is that, in this instance, the State Rights was the aggressor. The Linnæus was going on her way, near to the Pennsylvania shore. when the collision occurred; the State Rights, coming after her, had the whole breadth of the river to pass in; but, instead of doing so, she crowded on to the Linnæus, thus compelling her to turn towards Jersey, to keep herself off the Pennsylvania shore. Favoured by the course of the tide, which, at that place, set over to Burlington Island, the Linnæus was, at first, enabled to press the State Rights in that direction, but as soon as she lost this advantage the superior strength of the State Rights prevailed.

In the account of James Eyre, and of William Thornton, the pilot of the State Rights. there is nothing to contradict this evidence of Mr. Craft, or to remove or weaken the conclusion it leads to. William Thornton is very brief in his account of it. He says: About Bristol coal wharf, I tried to steer my course for the Bristol wharf; the Linnæus rather sheered over towards the Jersey shore; this brought the State Rights near to the flats. The witness told Captain Allen he had better stop. The captain said, "No: put the helm to steer on to the Pennsylvania shore." I did so; and we steered the Linnæus, by the same helm. just below the coal wharf. He says nothing to gainsay the position of the Linnæus near to the shore, when they came in contact, nor does he deny that he had the whole breadth of the river to pass her without a collision.

As to the transactions at the wharf at Burlington, I will forbear to repeat, in detail, the testimony of the witnesses who have spoken of it. Taking the whole together, the truth of the case appears to me to be that the State Rights came over to Burlington before the Linnæus, and found the steamboat Burlington lying at the wharf there. She went

alongside of the Burlington, and took in or put out some of her passengers across the deck of the Burlington, but not the whole, waiting for the departure of the Burlington to get in to the wharf. In the mean time the Linnæus came over and was also waiting to come to the wharf. The Burlington, having finished her business, cast off from the wharf to proceed on her passage, and the State Rights, lying alongside of her, was obliged also to draw off with her. The vacancy thus occasioned afforded Captain Reeves the opportunity to slip in to the wharf, as one of the witnesses expressed it, before the State Rights could return to it. She was, therefore, thus prevented from coming alongside of the wharf, but had to go to the lower end of it, and put her plank out there to receive whatever was to come on board. In doing this she came in contact with the bow of the Linnæus, and did her some damage. If the courtesy of the river gives, as I would suppose, the boat first arriving the right of going first to the wharf, then Captain Reeves committed a breach of this courtesy in taking advantage of the drawing off of the State Rights to let the Burlington out, to run in to the wharf before her. I cannot believe, as some of the witnesses do, that the State Rights had actually gone off with the intention of proceeding on her passage down the river, and returned with the design of running foul of the Linnæus. So gross an outrage ought not to be presumed from doubtful appearances; nor believed without the most satisfactory proof. I am satisfied that the State Rights returned to get to the wharf to take in such passengers or marketing as she had not got across the Burlington; and this opinion is strongly confirmed by the fact that she cast a line on shore and put out her plank at the end of the wharf, which would have been needless if her only object was to strike the Linnæus. If then the captain of the State Rights in his eagerness to get to the wharf for a proper and lawful purpose, and excited to some resentment by the manner in which Captain Reeves had got in before him, was not very careful in coming under the bows of the Linnæus, I am not inclined to visit him with any harsh condemnation for the consequences.

Upon the whole, as to the occurrences of the 6th of May, I regret that the confusion and uncertainty of the evidence relating to what happened between Bordentown and Bristol, including the testimony of Captain Reeves, have prevented so clear a view of the truth of the case as I could have desired. Still, in the encounter near the coal wharf, Captain Allen seems to have shown a consciousness of his superior strength, and a disposition to use it oppressively. The Linnæus was close on the Pennsylvania shore, while the State Rights had the whole river to pass on to Bristol without coming near her, and the superior speed of the former enabled this to be done at pleasure.

We come now to the transactions of the 30th of May, where we shall stand upon firmer ground, and with no substantial difference between the witnesses. Some of them are particularly entitled to confidence, from their character, the total absence of all interest in the controversy, the manner of delivering their evidence, and their clear and consistent accounts.

I will begin with the testimony of William Thornton, the pilot of the State Rights, that we may compare it, as we go along, with that of the witnesses for the libellants. After speaking of what happened at the coal wharf near Bristol, he says: Two or three weeks after this, coming from Bordentown, the Linnæus was ahead; he steered his course on the west side of the river, so as to get past the Linnæus; she kept sheering on the bar above the railroad wharf; by coming on a bar a boat will sheer, and you cannot help it; by sheering, the State Rights struck the after part of the Linnæus, but this did not arise from his altering his course. The State Rights got very near the railroad wharf before witness could change her course. There is a point puts out just there, and Captain Allen said. "They crowded us on the bar; we will crowd her on the Pennsylvania shore;" and this was done.

I presume, for it was not distinctly stated, that the crowding on the bar which Captain Allen alluded to, was when he was making the attempt to get between the Linnæus and the Pennsylvania shore, when he came on the flats, and took a sheer that carried him over to the railroad wharf. But why did he make that attempt? Why did he not pass down on the east side of the Linnæus, where there was room enough between her and the Jersey shore? It was by making this attempt that he was brought, by accident, according to Thornton, or by design, as the other witnesses believe, in collision with the Linnæus the first time. As to the second collision, a short time afterwards, that is, when the State Rights crowded the Linnæus on to the Pennsylvania shore, even Thornton testifies that it was wilful, and intended by the orders of Captain Allen, in retaliation for the real or supposed previous aggression on the part of the Linnæus.

It will be found that the differences between the evidence of the pilot of the State Rights and the witnesses on behalf of the libellants do not consist of contradictions, but of omissions in the evidence of Thornton, as I believe, from a want of recollection, and not from design. The stories of all are consistent, and may all be true. They may not agree in their opinions, but the main facts stated by them all are reconcilable.

On this part of the case—I mean the circumstances of the 30th of May—the libellants have produced a great number of witnesses, most of whom give so clear and consistent an account of them, that it is not possible to question their general accuracy.

Captain Reeves is first in order, although his evidence might be entirely dispensed with without injury to the case. He says that he left Bordentown on that day about two minutes before two o'clock: that the State Rights came after him and got up alongside, then put her helm up and ran into the Linnæus as hard as she could come. This was between Bordentown and the railroad wharf, about half a mile below. The State Rights then took a sheer, and went across the river towards the railroad wharf. So far he agrees with Thornton, except that the latter affirms that his boat flew off from her helm, or took a sheer by coming into shoal water, and that he did not alter the helm; whereas Reeves declares that the State Rights put up her helm and ran into him. Supposing the witnesses to be of equal credit, and the truth of the fact to depend only on them, I would say that it was better known to Thornton than Reeves, who may have inferred that the helm was put up from the change in the course of the boat, whereas Thornton, who had the helm, knew positively how the fact was, and has attributed the sudden change of course to another cause. Leaving this question, for the present, as it stands between these witnesses, we proceed with Captain Reeves. He says, after stating that the State Rights went across towards the railroad wharf, that he then got ahead; that the State Rights got her head down, and came after him again; that he took the Pennsylvania side of the river, and told his passengers to take notice that he was going to give the State Rights all the stream, and that he did so. The State Rights caught him again, and ran foul of him, striking him on the guard just forward of the wheel. The ladies on board were much alarmed. His passengers got ropes ready to tie the captain of the State Rights. Thornton also admits this second collision, and agrees with Captain Reeves as to its locality; but accounts for it in this way: The sheer on the flats had carried him over to the railroad wharf, where he had to stop his wheels; he then steered very nearly down the river, as straight as he could, when Captain Allen told him to steer to the Pennsylvania shore, where, it will be remembered, the Linnæus had gone to give the whole river to the State Rights, and there Captain Allen ordered the pilot to steer. Had the witness stopped here, we should have been ignorant of the motive and object of this order, and might have concluded it had reference to the point which projected below the railroad wharf; but the witness very frankly stated the motive of the order, as declared by Captain Allen himself. The captain said, "They crowded us on the bar; we will crowd them on the Pennsylvania shore."

John Longstreth, a witness on whom I have much reliance, says that, on the 30th of May, he left Bordentown in the Linnæus; the State Rights left a few minutes after, very soon overtook them, and appeared to be going past them on the Jersey side, but presently turned and came on the Pennsylvania side. I stop to remark, that this change of purpose is not accounted for by Thornton, who only says he was trying to steer his course on the west side of the river, but gives no reason for not keeping on and passing the Linnæus on the Jersey side, as Mr. Longstreth thought he was about to do, and as he might have done. The witness proceeds: When the State Rights had got on the Pennsylvania side, and nearly opposite to us, she turned and ran directly towards us; but missed the Linnæus about three or four feet. Of this movement Thornton says nothing. She, that is the State Rights, says Mr. Longstreth, immediately turned, and went between us and the Pennsylvania shore again; she then turned a second time, and struck us very near the hind part of the boat. This is the sheer of which Thornton speaks. The witness continues: We were then tolerably near the Jersey shore; so near that the State Rights had to stop her wheels. We kept on; the State Rights then came down on the Jersey side of us, and struck us in front of one of the wheel-houses, running us across near to the Pennsylvania shore. The Linnæus then stopped her wheels, and the State Rights went on. This witness says, as Captain Reeves does, that, when the State Rights first overtook them, she ran alongside, between them and the Jersey shore, and then passed over to the other side. The witness supposed she would pass them in the course she was taking when she overtook them, that is, on the Jersey side. And why did she not? No explanation is attempted; no reason is given why the pilot of the State Rights should change his course and try to steer on the west side of the river, between the Linnæus and the shore, when there was ample room on the other side, and in the very course he was going when he overtook the Linnæus. The wife of Mr. Longstreth was on board, and a good deal alarmed. The witness wrote to his father-in-law not to let his daughter come down in the Linnæus, on account of these occurrences, and he would himself have left her at Bristol, if the State Rights had not gone off before them. He thought there was no necessity for the State Rights to come in contact with the Linnæus. From her running on both sides of them, he thought there was room enough to pass. The impression of the witness, and of the other passengers, was that the captain of the Linnæus conducted himself very properly, and the captain of the State Rights very badly. He would not be willing to let his family go in the Linnæus so long as the same captain had charge of the State Rights. Some of the passengers of the Linnæus thought of boarding the State Rights, but he was not one of them. He is not acquainted with the shoals in the creek at Bordentown, nor with the state of the tide when the boats came out.

Benjamin Barton, who was examined out

of his turn, gives an account of the occurrences at the head of Burlington Island, upon which I have nothing more to remark than that he says he was on board the State Rights, and thought she would run the Linnæus on the sand; that he, with other passengers, went to Captain Allen and told him his boat was the strongest, that if he did not stop his wheels he would surely run the Linnæus on shore. The captain replied, that if it were not out of consideration for the ladies, he would put the Linnæus there, for there she ought to be. The witness also details the proceedings at the wharf at Burlington, and confirms my view of it. He was not on board on the 30th of May, to which I return.

William E. Tatem was, on that day, a passenger on board of the Linnæus from Bordentown. They left before the State Rights, and had proceeded about a mile down the Pennsylvania shore, when the State Rights appeared to be passing between them and Jersey; all at once she tacked about and ran towards the Pennsylvania shore. The witness thought she was coming into them, but she went a little astern. I remark again that this movement is not accounted for or mentioned by Thornton, although it caused the running on the flats which gave him the sheer he speaks of. The witness went to the stern of the Linnæus to see where the State Rights was going. She ran across as near as she could to the shore (here she got on the flats), and then turned again towards the Jersey shore. Witness thought she was coming into their wheel-house. She struck them on the side, near the stern, a very hard blow. The Linnæus was then heading directly down the river, and the State Rights directly across, so that she had to stop her wheels to avoid going ashore on the Jersey side. She then turned and struck them on or near the wheel-house, on the side next the Jersey shore; she lay along side of them, with her engine going, edging them over to the Pennsylvania shore by main force. The Linnæus would have gone on shore if Captain Reeves had not stopped her engine. All this was done, as Thornton testifies, by order of Captain Allen. This witness—Tatem—as the rest, says that the State Rights is the strongest and fastest boat; there is no comparison between them. She passed the Linnæus when she pleased, and came up with her when she pleased. He also testifies to the mild conduct of Captain Reeves, that he tried to shun the other boat, and kept his course down as near as he could. The witness has no doubt the attacks were made intentionally.

Alexander S. Reed was on board the Linnæus on the 30th of May. They left Bordentown about an hundred yards in advance of the State Rights; the latter ran down between the Linnæus and the Jersey shore, her bow overlapping their stern about fifteen or twenty feet; she then dropped astern and took her course to the Pennsylvania side.

At the distance of about twenty yards, the Linnæus continuing her course, the State Rights made a sudden tack, with intention, as the witness thought, of running into them, but fell astern. She then put about again and ran between the Linnæus and the Pennsylvania side a second time, going rather further ahead than on her first attempt. She made a second tack, and the witness thought she would strike them about the wheel-house. She struck them, however, on the starboard side, about two feet from the stern, and carried away part of the moulding. She then passed over near to the Jersey shore, and tacked again, came down the river and ran into them sideways, her bow striking them just before the wheel-house. She continued working her engine, edging them on to the Pennsylvania shore; Captain Reeves ordered his engine to stop, and thus dropped astern while the State Rights went on. The witness expressed a firm belief that it was the intention of Captain Allen to run them ashore.

John Postall, another passenger, gives substantially the same account.

As regards, then, the proceedings of the 30th of May, we have a clear, consistent, and circumstantial history from the witnesses of the libellants, which is opposed, absolutely, by nothing in the way of contradiction or explanation, on the other side. The manner in which the pilot of the State Rights accounts for the sudden sheer of his boat, which produced the first collision, might be adopted if it were met only by the account given of it by Captain Reeves, but can hardly be admitted when tested by the evidence of other witnesses to the transaction. As to the first attempt, which failed, the pilot gives no explanation, and the second collision he declares was made by order of Captain Allen.

The trespass and assault complained of on the thirteenth of June, when the Linnæus was lying off Bristol wharf. The State Rights and steamboat Burlington were both there, and the Linnæus was waiting, in the stream, for their departure, to get in. The blow was a very severe one. It knocked the stem and cutwater of the Linnæus off, tore up the plank shear, and deck of the false bow; knocked, as Captain Reeves says, some of his passengers over on the deck, and broke some of the bar furniture.

This attack is detailed very circumstantially by Isaac M. Reeves, a passenger in the State Rights, and unconnected with Captain Reeves. If he is not greatly mistaken in his view of the occurrence, the misconduct of Captain Allen was most wilful and violent. The Linnæus was lying still in the stream, and the State Rights, having left the wharf at Bristol to go to Burlington, might have gone on either side of her. Indeed, Captain Allen did not hesitate to avow the design; he did not claim the apology of necessity or accident. When this witness told

him that the women were much frightened, and asked him the reason of his running against the Linnæus; his reply was, to teach Captain Reeves better than to stop his boat in the way. After they left Burlington, the witness, with other passengers, fell into conversation with Captain Allen, and asked him the reason of so many outrageous attempts being made on the Linnæus. His answer was remarkable; he said that Captain Reeves, some time before, had told him that the owners wished to sell the Linnæus, and had, therefore, fitted her out to run on that line, supposing that the owners of the other line would take a fancy to her and purchase her, and that he, Captain Allen, thought it was a great imposture, and he was therefore fully determined to sink her or lay her up, so that they would have to take her off the line. This was his avowal to his own passengers, and it is difficult to imagine anything more daring or reckless of consequences.

Joseph Evans, who was standing on the Bristol wharf, says there was ample room for the State Rights to pass the Linnæus, but she ran foul of her nevertheless. The witness judged that the State Rights deviated from her course to run foul of the Linnæus.

James Dougherty gives, out of order, an account of the proceedings of the 30th of May, similar to those already given. So of John Richmond, who was on board on the 13th of June also. Several other witnesses testify to the various collisions, with no material variance.

Taking the facts of this case to be as the witnesses have testified, and 1 can have no other knowledge of them, I do not see how the inference can be avoided, that at least as to the affairs of the 30th of May and the 13th of June, the attacks upon the Linnæus were wilful and malicious, and a most unjustifiable use, on the part of Captain Allen, of superior power, to injure and crush a weaker rival. If such were not the fair and unavoidable deduction from the circumstances of the several transactions, the express declarations of Captain Allen would remove all doubt on the subject. He never seems to have sought to shelter himself under any apology from accident, or the necessity of his position. At one time he alleges that he was retaliating some previous offence of Captain Reeves; at another he will teach him not to be in his way; and at another he would punish an imposition, which he supposed the owners of the Linnæus were attempting to practise on his owners. And for such reasons he takes upon himself to obstruct the navigation of a public river, to "sink or lay up" a rival boat, to put in jeopardy the safety of his passengers, and produce alarm and confusion among them. The opinion which we have had, from one of his friends, that he is an amiable, affable man, with a good disposi-

tion, will scarcely protect him from the consequences of such a reckless temper, and such dangerous designs.

The only remaining question in this case is as to the damages to be awarded to the libellants. Some cases have been cited on this point which should be briefly noticed. It is contended that, where both parties are in fault, the damages must be shared. Jac. Sea Laws, 328. I presume the plain meaning of this is that they were both in fault, at the time, and in the acts, which produced the injuries to both, and not that one of the parties had, on a previous occasion, been in fault with the other. I should offer another modification to the generality of this rule in cases where the faults are egregiously unequal; for a slight fault on one side would not justify a destructive retaliation on the other, even at the same time. In this case, however, on the evidence by which I am to judge it, the fault was altogether on the part of the respondent, at least in relation to such of the injuries as will have weight on my judgment. Again, it is said that in the case of collision of vessels, there can be no recovery beyond the actual damage. This may be true in cases of venal negligence, or a want of due skill and care, by which the injury occurred, but can hardly be applied to a case of a wilful and malicious assault upon the property and rights of another, with a direct view to profit and gain. The injustice is manifest, of putting such a case upon the same footing with one of mere want of care and skill.

The defence proceeds one step farther in the march of immunity and irresponsibility on the part of the owners of the State Rights, for the wrongs done by their captain. The violence and wrongs are charged and proved to have been wilful and malicious. What, then, it is asked, have the owners of the vessel to do with them? It is admitted that they are bound to employ competent, careful, and skilful agents; but it is denied that they are answerable for the wilful torts of their captain. I cannot accede to this doctrine. In the page of Jacobsen, cited for the respondent on another point, it is said: "If the damage is wholly created by one ship, and that through the fault of the master, he is to repair the damage alone, if he is able; otherwise, the owners, as far as their interest in the vessel and freight extends." It is not clear what is meant by "the fault of the master." Whether it was intended to embrace only negligence and want of skill, or wilful wrong also; the generality of the expression comprehends both, and there are other reasons for this construction. We may, however, be satisfied on this point by other authorities.

In the case of Bussy v. Donaldson, 4 Dall. [4 U. S.] 206, the chief justice, in giving the opinion of the court, says, that the defendant admits that, in ordinary cases, the owner of a ship is answerable, civiliter, for the

injuries committed by the captain and crew, but that, in that case the vessel was in charge of a pilot who was not the voluntary agent of the owner, but an officer of the public. The owners were nevertheless held liable. It was a case of running foul of, and sinking a vessel, by negligence and unskilful management, but the principle of the liability of the owner makes no distinction between wilful and negligent acts of the captain; the line drawn is between a civil and a criminal responsibility, between a tort and a crime committed by the captain.

In the case now before this court, I do not understand it to be denied, that the owners of a vessel are answerable for the acts of their captain done within the course and scope of his employment and business. Is this not enough for this case? Assuredly it was within the course and scope of the employment and authority of Captain Allen to direct the State Rights to be steered at his pleasure; he had full power to do this, derived from his owners, and all on board were bound to obey his orders, without interposing their judgment as to the consequences to him or his owners. If by the execution of such an order a wrong is done to another party, on what principle of the common or maritime law can the owners of the offending vessel, the principals of such an agent, whom they have armed with the power to do the wrong, throw the responsibility from themselves? It is widely different from the case of the commission of a crime by the captain, which cannot be imputed to his owners, or be intended to come within the employment or authority committed to him.

In the case of Dias v. The Revenge [Case No. 3,877], Judge Washington gave a close attention and labored examination to this subject. The question there was, whether the owners of a privateer were liable to make good the damage which a neutral had sustained by an act of piracy, committed by those to whose management the owners had committed their vessel. The owners were not held responsible for the piracy, but, it is said, if the captain "had made an illegal capture, whether wilfully or by mistake, the owner would have been answerable for all damages resulting from the act." The reason seems to be because in making a capture as a prize, the master was acting in execution of the business with which the owners had charged him. The judge says: "His commission authorized him to seize as a prize of war; to exercise an acknowledged and belligerent right, in doing which he might be guilty of a mistake, or might wilfully abuse his right; in either case he acts at his own and his owner's peril." Not so, if he turns his back on the business entrusted to him, and commits acts of piracy, for which he was not directly or impliedly employed. In our case, the management and steering of the State Rights were put into the hands and under the will and discretion of Captain Allen; it was his business, his employment and right, and if he abused his authority by mistake, by negligence, or wilfully, to the injury of another, both he and his owners are responsible for it. In reviewing the common law doctrines of master and servant, Judge Washington considers them to be analogous in their principles, but not the same with those that govern the cases of the owner and master of a vessel. He says: "The case of McManus v. Crickett, 1 East, 106, proves too much in relation to a case of capture, for which it was cited. It admits, that for the mischief arising from the unskilful or negligent driving of the master's carriage, the master is liable in an action on the case; but not so if it were wilfully committed; because, it is said, in the latter case the servant does not act in pursuance of the authority given him. Neither does the master of a privateer act in pursuance of the authority given him, when he wilfully commits spoliations on property seized as prize, and yet in this, and similar cases, the owners are clearly liable for the misconduct of the master." The judge then passes from the supposed analogy of master and servant at common law to cases governed by the maritime law in relation to owner and master, and he sums up the principle thus: "We find that the former (the owner) is liable for all acts of the latter done in the execution of the business in which he is employed, by which third persons are injured, whether the injury was occasioned by the wilful acts or by the negligence and want of skill of the master." He illustrates this principle by several familiar examples, all showing that for an abuse of the trust by wilful misconduct, and by want of care and skill, of the master, his owners are responsible. Dean v. Angus [Case No. 3,702]; Fletcher v. Braddick, 2 Bos. & P. (N. R.) 182; Reynolds v. Toppan, 15 Mass. 370; The Dundee, 1 Hagg. Adm. 109, 113, 120; Abb. Shipp. pt. 3, c, 1.

The question of the liability of the owners of the State Rights being, in my opinion, thus settled, the damages to be recovered, for the wrong and injury done, only remain to be considered. This may in a measure depend upon what we understand by exemplary damages. In my estimation they are not, strictly and legally speaking, damages given dehors and beside the act of wrong complained of, or the injury done by it; no new and subsequent injury or loss is brought in to aid or add to the damages; they are attached inseparably to the tort committed upon the person or property of the complainant. The damages which are called "exemplary" are nothing more than a high and exaggerated estimate of the wrong or injury, which courts and juries take upon themselves to allow, bringing into the calculation, not a new and distinct injury, but something beyond the mere pecuniary loss or personal suffering, still belonging, how-

ever, to the original wrong and to no other. I would instance the cases of arrest by a general warrant issued by a secretary of state; in which enormous damages were given by the juries, and affirmed by the court, although the personal suffering was really nothing, but the essential, invaluable, political rights and liberty of the plaintiff were supposed to have been violated, and this wrong was added to the personal injury as a part of it. This exaggerated estimate of the damages of the tort which is the ground of the action, is generally resorted to on some principle of public policy, as in the cases just mentioned. So in the case of an atrocious and dangerous libel, the real injury to the plaintiff may be inconsiderable, but the preservation of the public peace calls for a high estimate of the wrong, that private revenge may not be resorted to for such injuries. Consequential damages are of a different character; they arise from a new injury sustained in consequence of the first wrong, and derived from it, but which is not inseparable from it, but may or may not have happened according to circumstances. Such was the case cited from Jac. Sea Laws, 328, in which a vessel was so damaged by being run down, that, in refitting, she lost the tide, and was taken by a privateer. Her capture was the consequence of the first wrong, but not a part of it.

I think, therefore, that it is not legally correct, to say that a court cannot give exemplary damages, in a case like the present, against the owners of a vessel. If any damages may be awarded, the sound discretion of the court must be exercised in ascertaining them. If they are excessive they will be mitigated, by an appellate tribunal, whether they be called "exemplary" or not; if they are just and reasonable, they will not be disturbed because of the name that may be attached to them. There is no subject upon which more repeated and solemn complaints have been made to the public, and few of a deeper interest to the community, than the accidents, always attended with frightful alarms, and sometimes by the most fatal and melancholy consequences, from the collision of steamboats. Many of them have been occasioned by the contest between rival boats, maintained with a reckless disregard of human life. Our river has been particularly exempt from these disasters, and it should be the determination, as it is the duty, not only of the courts when appealed to, but of every good citizen, to keep it so. Although from the notoriety of the transactions complained of in the libel, their repetition several times in a few weeks, and from a publication made by some of the passengers of the Linnæus, I cannot go so far as to say, as Judge Story did in the case of The Amiable Nancy, 3 Wheat. [16 U. S.] 558, "that the owners of the State Rights were in absolute ignorance of the conduct of their captain, that they are innocent of the

demerit of this transaction, having neither directed it, nor countenanced it, nor participated in it, in the slightest degree;" yet I am far from believing that this respectable company, under the direction of individuals highly and justly esteemed, could have been truly and particularly informed of these proceedings of Captain Allen, and especially with the vindictive motives he avowed for his misconduct; but they have been too inattentive to the manner in which he was using the authority they had committed to him. I am therefore not disposed to inflict upon them "vindictive damages," nor to make an extravagant estimate of them. There is reason to believe, from some of the testimony, that the injury to the body of the boat may be greater than can be precisely ascertained at this time. In a case like this, the actual damage is not limited by the cost of repairing the broken parts of the boat. The loss of business, by laying her up for repair, by preventing passengers from going in her on account of the danger and alarms of these collisions, are proper items of charge in estimating the damages. But I can by no means approach the amount which the libellants have imagined they are entitled to. I shall do what on my best understanding all the circumstances of the case, I think its truth and justice require of me.

Decree. I do adjudge, order, and decree, that the libellants shall have and recover the sum of two hundred and fifty dollars, damages, for the wrongs and injuries complained of in their libel; and that the steamboat State Rights be condemned and sold for the payment and satisfaction of the said damages, with costs of suit according to the prayer of the libel.