YALE LOCK MANUF'G CO. (GREEN-LEAF v.). See Case No. 5,783.

YALE LOCK MANUF'G CO. (SARGENT v.). See Cases Nos. 12,366 and 12,367.

YANCY (SHELBY v.). See Case No. 12,746.

---

## Case No. 18,124.

### The YANKEE et al. v. GALLAGHER.

[McAll. 467.] [1]

Circuit Court, N. D. California. Jan. Term, 1859. [2]

MARINE TORT — WHAT CONSTITUTES — ABDUCTION AND DEPORTATION—ADMIRALTY JURISDICTION.

1. Where a tort is a continued act and not separable, and a portion is committed on land and the remainder on the high seas, the jurisdiction of it attaches to the common-law courts.

2. But if the tortious act originates in port, and is not a perfected wrong until the vessel leaves the port, it is a continuous act and travels with the tort-feasor and the injured party during the whole voyage, and comes within the jurisdiction of the admiralty upon the principle enunciated in certain cases, that if a thing be taken on the high seas and brought to land, it is appropriate to a court of admiralty to decide the question as a marine tort.

[Cited in The Florence, Case No. 4,880.]

3. The torts in this case having been committed by different persons, and in different places, are separable.

4. The action for the trespasses committed by the parties on land is cognizable in the courts of common-law.

5. That committed by the party now sued, is within the jurisdiction of admiralty as a marine tort.

6. It originated on waters within the ebb and flow of the tide within the admiralty jurisdiction, and was continued on the high seas. Such locality gives the jurisdiction.

7. The law implies a corrupt motive in the perpetration of a tort by one who commits it in the departure from a known duty and in wanton violation of law.

8. In cases of contract the motive of defendant is not inquired into, to increase the compensation to be made by him.

9. In torts the malicious intention may be said to increase the injury.

[Cited in The Albany, 48 Fed. 565.]

Appeal from the district court of the United States for the Northern district of California.

A libel was filed in the said court in rem and in personam, and objections filed to the jurisdiction of the court. The exception to the jurisdiction in rem was sustained; and the jurisdiction as to the proceeding in personam was maintained, and the exception to it overruled. The court rendered a decision on the merits, against the respondent, for the sum of three thousand dollars [Case No. 5,196], from which the present appeal has been prosecuted.

Delos Lake, for appellants.

J. B. Manchester, for defendant.

McALLISTER, District Judge. The two questions which arise are—(1) As to the juris-

1 [Reported by Cutler McAllister, Esq.]
2 [Affirming Case No. 5,196.]

diction of this court of the present proceeding in personam. (2) As to the amount of damages.

The libel propounds that on the 25th May, 1856, in the city of San Francisco, while engaged in the discharge of his duties as night watchman, in the service of the government of the United States, at about 8 o'clock p. m., libelant was seized upon by armed men; that he represented to them that he was in the discharge of his duties as a watchman in the employment of the United States; that, notwithstanding, he was compelled to accompany his captors; that they carried him to a place in the city of San Francisco known as the "Vigilance Committee-Rooms," where he was delivered to another body of armed men, and by them confined in a cell. After remaining there several days, without being informed of any charge of any specific offense; without having been confronted with any accuser or witness; a document was read to him which he was told was his sentence, in the following words: "You, Martin Gallagher, are a rioter, or disturber of the public peace, a promoter of quarrels at the polls on days of election. You are a bad man, and you are banished from the state of California, never to return under the severest penalties." That, about midnight on the 5th June, 1856, a party of armed men came to the cell where libelant was confined, put irons upon him, took him to the rear of the building, where they were joined by a larger party of armed men, who directed that no noise or speech should take place, marched him with other prisoners to California-street wharf, and put them on board a small tug called the Hercules, with a guard of armed men. The tug ran alongside the ship Carrier Dove, towed her to sea, returned and "lay to" on the bar; that when the Yankee, standing out to sea, came opposite the Hercules, she "hove to," and the armed men on board the Hercules compelled libelant to get with others into a small boat, in which they were conveyed on board the Yankee, of which the respondent was at the time master. The small boat remained so short a time alongside the Yankee, that, in the language of one of the respondent's witnesses, "there was not time to speak half a dozen words from the time they came on board until I left in the boat." The Yankee went immediately to sea, and the libelant was carried off, and landed on a foreign shore in the Sandwich Islands.

Of the truth of the foregoing facts there can be little doubt. Several witnesses who had been members of the vigilance committee, among them George R. Ward, who is stated in the libel to have been the person who announced to the libelant, in his cell, the so-called sentence, were sworn, and still no material fact of the foregoing is denied by any one of them. That sentence is ascertained to have been issued by a body of men authorized by no law, and who substituted their private judgments for the action of those judicial tribunals to which the constitution and

laws of their country had confided solely the distribution of justice. With the motives of those who thus acted, this court has nothing to do. With their acts, so far as they bear upon this case, it is its duty to deal. It is, therefore, constrained to attribute to those acts, and to the conduct of the respondent so far as it is connected with them, the character which the law annexes to them and to it. It is for the transportation and abduction of the libelant from his country to a foreign shore, with a view to carry out the proceedings of that unauthorized body, that he has appealed for the vindication of his rights to the laws of his country.

The first ground taken in defense to this appeal, is want of jurisdiction in this court. Under this ground, the first proposition presented by the argument for the defense is, "that all these statements cannot be set forth as matters of aggravation nor be treated as surplusage, and the court be thus enabled to confine its action to that part of the case which has reference to the injuries committed on the high seas; or in other words, it is asked, what is the gravamen of this action?" "How can it be said that the imprisonment at sea constitutes the gist of the action, and not the seizure and imprisonment on land? If it were possible to separate them, one would as clearly appear to be the ground of action as the other; and where it is impossible to separate them, for the reason that there is one continued trespass and false imprisonment, it is not quite as clear that the one is as much the gravamen of the action as the other." Again, "can the libelant maintain two separate actions, one for the injuries suffered on land, and the other for the injuries suffered on the high seas?" Lastly, to sustain this last point, and also that a single tort will maintain but one action, various common-law authorities from New York, and one from Massachusetts, have been cited. The court disposes of this point and the authorities with the remark, that it admits the legal proposition they are cited to support, but does not, for the reasons it will give, consider the law enunciated by it applicable to this case.

The last ground taken to which we shall advert is, that the acts of defendant Smith constitute but one cause of action; and that part of such cause being exclusively of common-law jurisdiction, this court cannot act on any part of it as a court of admiralty. It will be perceived that the argument of defendant's proctor is in the form of interrogatories. A response to an argument thus propounded, must be replied to by stating the views entertained of this case by the court in one condensed answer.

1. The court does not propose to treat the acts set forth in the libel as done by third parties on the land as surplusage, nor as part of the tort charged upon the respondent; but to consider and to retain them as matters of inducement, as facts going to aggravate the character of the offense committed by the present party, and as serving to show the animus with which he acted in the commission of the marine tort for which only he is sued. It is difficult to perceive why the court cannot so consider them. To illustrate, suppose a libel filed against a master for maltreatment and cruelty towards a passenger, would not the previous condition of the passenger on shore, his protracted sufferings and illness, and the knowledge of all this by the master, and his advice to the patient to go with him to sea for the improvement of his health be matters proper to be alleged and proved to qualify the character of the tort and the motives of the perpetrator? The respondent is called to answer for his own acts, not for those of third parties on the land prior to the time at which he began to violate the rights of the libelant. It is urged that the cause of action in this case cannot be separated, because there is one continued trespass and false imprisonment. The court cannot perceive against the present respondent but one cause of action, the abduction of the libelant against his will, and the transfer of him to a foreign land. There are cases where the perpetrator of the tort is the author and architect of the whole, in which the tort is regarded as a unit, as a continued act. They have no application to this case. Thus, in Plummer v. Webb [Case No. 11,233], where the tort was the abduction by a master of a vessel of a minor, and damages were sought, Judge Story says: "Here, it is true, the tortious act, or cause of damage, might be properly deemed to arise in port; but it was a continuing act and cause of damage. * * * It was in no just sense a complete and perfected wrong, until the departure of the vessel from the port; and it traveled along with the parties as a continuing injury through the whole voyage." In Rolle, Abr. 533, cited in the last case, it is said: "If a man take a thing upon the sea, and bring it to land, the suit for that may be in the admiralty court; for it is a continued act." Continued by whom? Certainly by the original tort-feasor. In Dean v. Angus [Case No. 3,702] it is decided of a single tort; if such act be partly of common law, and partly of admiralty jurisdiction, the common-law courts are to be preferred. But no one of these cases, nor the common-law cases cited from New York, touches the case at bar. Here, the respondent is sued for transportation of the libelant to a foreign shore against his consent. The act from its locality, is clearly within the jurisdiction of this court. It commenced on waters within the ebb and flow of the tide, and was continued on the high seas. In Waring v. Clarke, 5 How. [46 U. S.] 441, the supreme court decided that in cases where admiralty jurisdiction depends on locality, it extends to all torts committed on the high seas, or within the ebb and flow of the tide as far up a river as the tide ebbs and flows, although the place be infra comitatus. In this case,

the tort originated and was carried out by the respondent at a locality which brings it within the jurisdiction of admiralty as a marine tort. The decision of the district judge on the exception to the jurisdiction of the court, must be affirmed.

2. We now come to the question of damages. In its adjustment, some embarrassment arises out of the difficulty which exists in keeping distinct from the great wrongs done to libelant by other parties, those committed on him by the present party. Testimony was given in the district court as to the character of libelant, without any objection. In the view the court entertains of this case, the consideration of the libelant's character should not influence to any extent the determination of the question of damages on the trial of this issue. In fact the district judge has repudiated the loss of character in his estimate of damages; for he states in his opinion, that the same "cannot be properly said to be the consequence of that portion of the torts committed upon him, of which a maritime court can take cognizance."

After a consideration of the testimony, the district judge says: "It is but just to say, that the charge that the reputation of the libelant was notoriously bad, that he was always engaged in election rows, and ballot-box stuffing, is not only unsustained by the evidence as to what his character was, but unsupported by any testimony as to particular facts which might have justly given him that character." But suppose the reputation of libelant to have been good, it was not blasted by his abduction, or any alleged wrong done on the high seas, but by the action of third parties. It was the sentence of the vigilance committee which branded him with the mark of Cain. The mere fact of transportation by the respondent could not have wrought the moral ruin on the libelant, he therefore should not be made responsible for it. If on the contrary, the reputation of libelant was bad, and he was a bad man, an evil doer, such fact could not justify or legalize the action of his self-constituted judges. The law does not even regard malefactors in such a light. A distinguished writer has well said: "The law withdraws its protection from a malefactor while actually engaged in illegal acts; but at any other moment, it protects his person and property as impartially as those of others. If a burglar breaks into my house, or a pick-pocket thrusts his hands into my pocket, I may on the instant knock him down. But, if I break into a notorious felon's house, and rob him. I am just as great a felon in the law's eye as if I so robbed an honest citizen; and so, if I attack a burglar's or a pickpocket's person and life at any moment when he is not feloniously engaged, I am none the less a villain in the law's clear eye because my villainy is aimed at a habitual villain. And here the law is not only just

but expedient; for were such fatal partialities admitted, we would soon advance from doing acts of villainy upon villains to calling any one a villain and then wronging him."

With the motives of those, as before stated, who pronounced the sentence which was carried into execution by the respondent, this court has nothing to do; but it is its duty to apply to these acts in connection with the issue of damages in this case, the consequences which the law annexes to them. In order to do so, it is necessary to ascertain whether the respondent knew what had been done to the libelant, and that he willingly lent himself to the execution of the so-called sentence. That he was aware of what he was doing; that he acted with his eyes open; that he knew an illegally condemned man was in his possession to be transported from his country, the evidence satisfies me, has been proved. The existence of the vigilance committee was open, public, notorious; the results of their action were at the time known to every man, woman, and child in San Francisco. If the respondent knew nothing of it, he was the only human being in the city who did not. But the fact that the steamer Hercules lay to, with the libelant on board, in the harbor; that the respondent, master of the Yankee, went within one hundred and fifty yards of the steamer, made a tack, came right close up to her and threw the main-yard aback, and remained until a boat came to her from the Hercules with the prisoner on board; the presence of armed men in time of profound peace; the precipitation with which the delivery on board was made (one of the witnesses for the respondent—Abbott—stated that "there was not time enough to speak half a dozen words from the time they came on board until I left in the boat"); the instant filling away the sails and departure of the ship,—are all facts to prove that respondent's action was voluntary. But if there could be any doubt of the complete understanding by the respondent that he was carrying out the behests of the vigilance committee, it is removed by the fact that he received money for the act he was about to commit. Geo. R. Ward states he did not engage the passage himself, but he knows that the passage was paid. Another witness swears that respondent said, "that arrangements had been made for our passage." There can be little doubt that the act of the respondent was voluntary, in full knowledge of the position in which the libelant stood at the time of his being brought on board, and that he also had a foreknowledge of what was to be done by him. What effect this will have on the subject of damages must be considered hereafter. In the assessment of damages a marked distinction exists between cases of contract and tort. In the former, the motive of the defendant is not inquired into in order to

augment the remuneration to be made by him. In the latter, the absence of evil motive cannot be set up as an excuse so as to bar the action. I "had learned," said Lord Kenyon, "from Bacon's Maxims, that there is a distinction between answering civiliter and criminaliter for acts injurious to others: in the latter case, the maxim applied, 'actus non facit reum, nisi mens sit rea;' but it is otherwise in civil actions where the intent is immaterial if the act be injurious to another." Haycraft v. Creasy, 2 East, 104. If, therefore, the transportation were a mere trespass, unaccompanied by no evil motive, the absence of such motive would be no bar to the action. But where the law imputes a corrupt intention to the party, then the question of exemplary damages arises in addition to damages merely actual.

Sedgwick, in his treatise on Damages, says: "The malicious intention may be said to increase, in fact, the injury; and the doctrine of exemplary damages might be reconciled with the strict notion of compensation." The author then proceeds to cite cases to prove that the idea of compensatory damages was abandoned, and that of punitive introduced. Sedg. Dam. 456. But a preliminary inquiry arises: does the law impute malice or a corrupt motive to the respondent in the tort he has committed? When the libelant stood before the respondent on the deck of an American ship, of which he, the respondent, was master, under the circumstances heretofore detailed, he (the respondent) must have known that to carry the libelant off, against his consent, and land him on a foreign strand, was "a willful departure from a known duty." There can be no doubt of this; and, if so, it was proof of malice and an evil motive. In the case of U. S. v. Cutler [Case No. 14,910], speaking of the term "malice," as used in the act of March 3, 1835 [4 Stat. 775]. which punishes the offense of a master inflicting cruel and unusual punishment upon a seaman, the court say, that the word "malice" means "a willful departure from a known duty." But again, if the respondent knew the act was unlawful and did it intending to take the consequences, such wanton violation of law fixes upon him a malicious and corrupt motive. This principle is enunciated and was applied to the defendant in that case, who had resorted to a mode of punishment inhibited by law. If, in such a case, the violation of law is deemed per se proof of malice, a fortiori it should be annexed to the act of the present respondent, who availed himself of the protection of his country's flag, his character as an American citizen, and his position as a master of an American bottom, to violate in the person of an American citizen (however humble he may be), the constitution and laws of his country. This "willful departure from a known duty," "this wanton violation of law," authorize the assessment of exemplary damages. In Huckle v. Money, 2 Wils. 205, the action was for trespass, assault, and imprisonment; the act complained of being the arrest of the plaintiff under a general warrant. No actual ill treatment was alleged. A verdict for £300 damages was rendered; and a new trial was moved on the ground of excessive damages. Lord Justice Pratt made the following decision: "I know not what damages I should have given, if I had been upon the jury; but I directed and told them, that they were not bound to any certain damages. The personal injury done to the plaintiff was very small, so that if the jury had been confined to consider the mere personal injury, why, perhaps, £20 would have been thought sufficient; but the small injury done to the plaintiff, or the inconsiderableness of his life and station, did not appear to the jury in that striking light in which the great point of law touching the liberty of the subject appeared to them on the trial; they saw a magistrate over all the king's subjects exercising arbitrary power, violating magna charta by destroying the liberty of the subject by insisting upon the validity of this general warrant before them; they saw the king's counsel and the solicitor of the treasury endeavoring to support and maintain the legality of the warrant in a tyrannical and severe manner. These are the ideas which struck the jury on the trial; and I think they have done right in giving exemplary damages." If under the British monarchy a willful violation of law in the person of a British subject, is regarded by the judiciary as a case for exemplary damages, this court cannot consider that a much grosser violation of law in the person of an American citizen should be deemed by the courts of this country as fully recompensed by an amount in dollars and cents which may cover the actual loss of time and expenses of the injured man. In the case referred to, the amount of personal injury was small, an arrest of a few days, to be compensated for sufficiently by £20. The plaintiff acted under the color of legal process issued under the sanction of constituted authorities; and yet the gross violation of law was visited by exemplary damages to an amount nearly fifteen times the value of the actual damages.

There is another consideration which must receive the attention of this court, which controls its action in the exercise of its appellate jurisdiction. On this point, in the case of McGuire v. The Golden Gate [Case No. 8,815], decided at the July term, 1856, it was said "that ordinarily this court does not interfere with the amount of damages decreed by the court below. The district judge has the witnesses before him, and, therefore, has an opportunity of arriving at the truth, not within the grasp of this court, where the testimony is in writing. When, therefore, no additional testimony is taken,

I do not feel inclined hastily to disturb a decree on the point of damages." Certainly, in a case where it appeared that manifest injustice had been done in the assessment of damages, or error in law had been committed, it would be the duty of this court to interpose. I can see none such in this case. The libelant was carried off against his consent from home and country, and was by that act divested of his means of support, deprived of an office under the government which gave him a monthly income of $130, was held falsely imprisoned for upwards of a month. All these wrongs traveled with him and the tort feasor during the voyage, and were consummated by landing him some thousands of miles from home, amid strangers, in a foreign country, with his indorsement, that he was a man unfit to live in a civilized country,—an hostis humani generis. And all this was done by respondent in violation "of a known duty," and in wanton contempt and violation of law. I, therefore, cannot say that injustice has been done in the assessment of damages by the district court. A decree will be drafted affirming the decree of the district court, and handed to the judge for signature.