## Case No. 5,196.
### GALLAGHER v. The YANKEE.
[Hoff. Op. 456.]
District Court, N. D. California. Jan. 17, 1859.[1]

J. B. Manchester, for libellant.
D. Lake, for claimant.

HOFFMAN, District Judge. The libel in this case is filed to recover damages for a marine tort. The facts are clearly established by the evidence. It appears that the libellant, who was a night watchman in the custom house, was, on the 25th May, 1856, seized by certain persons acting under the order of the vigilance committee, and conveyed to the rooms of the association, where he was held as a prisoner for about a week. During his confinement a kind of investigation with regard to his character and conduct was made by the committee. The investigation, called by them "a trial," was conducted in the absence of the prisoner, by examining such witnesses as were produced against and for him. The result of the examination was the conviction of the accused, not of any particular offense, so for as it appears, but of being a "disorderly character," "a pest to society, and a nuisance." He was, therefore, sentenced by the committee to "banishment from the state, never to return, under the severest penalties," i. e. under penalty of death. In pursuance of this "sentence," the libellant, with several others, was taken by an armed body of men from his place of confinement in this city, and put on board a steam tug, which conveyed him and his guard to the Heads. The bark Yankee, which was beating out to sea, was there overhauled, and the libellant, with two other persons under a similar sentence, were placed on board of her.

Much testimony was taken, with a view of showing the particular conduct and language of the libellant, when he was going on board the vessel. It does not appear that either he or the other prisoners made any very strenuous opposition to going on board. Such opposition, they no doubt were aware, would have been fruitless; and it is probable that they were happy to escape in any way from the power of a body of men at whose hands

[1] [Affirmed in Case No. 18,124.]

they had for so long a time been under daily apprehension for their lives. It was evident, however,—and the fact was not seriously denied at the hearing,—that the master of the bark was fully aware of the circumstances under which the libellant and the other prisoners were placed on board his ship, and that an arrangement had previously been made with him to receive and convey them to Honolulu. He undoubtedly endeavored to evade the responsibility he was incurring, by attempting to obtain from the prisoners some declarations or admissions that they were willing to go. But he must have been aware that they could, in no sense, be deemed voluntary passengers, and that the answer of Gallagher, to the effect "that he supposed he had no choice in the matter," truly described his situation and expressed his feelings. During the voyage, the libellant and his companions appear to have been treated with kindness, and after their arrival at Honolulu a not unfriendly intercourse was kept up between them and the captain. They appear to have considered, and perhaps not unreasonably, that the principal authors of their wrongs were the vigilance committee, by whom they had been arrested, imprisoned, and sentenced to banishment, never to return, under penalty of death, rather than the master, who had lent himself and his ship to carry out the "sentence."

The facts which have been detailed show, however, beyond a doubt, that the respondent has been guilty of a marine tort of a very grave charcter. So long as our country remains under the dominion of law, and so long as the great constitutional provision which secures the citizen his life, his liberty, and his property, until deprived of them by due process of law, are prized by the American people, and are enforced by the courts, the deportation of a citizen to a foreign country in an American ship, commanded by an American master, in pursuance or execution of a sentence of an illegal and self-constituted body of men, must remain a marine tort of a most flagrant character.

But in estimating the damages which should properly be awarded against the respondent, a serious difficulty is encountered. It is obvious that by far the greater part of the wrongs which the libellant has sustained are matters over which an admiralty court, having jurisdiction only of marine torts, has no cognizance. His arrest, his imprisonment, and the so-called "sentence," which fixed an ineffaceable stigma on his name, were matters occurring on land, and wholly beyond the jurisdiction of a maritime court. For the redress of these wrongs he must look to the tribunals of the state of which he is a citizen; and the jurisdiction and remedial power of this court must be confined within its legal and constitutional limits, unaffected by any considerations as to the ability of libellant to obtain justice in any other form.

It is urged that the libellant was unable to return to this city for a very long period, and that he remained an exile from his country, destitute and degraded, until permitted to return by the revocation by the vigilance committee of his original sentence. But it is clear, from the bare statement of the case, that his protracted banishment cannot be attributed to the mere fact that he was conveyed by the respondent to the Sandwich Islands, and of that act alone this court has cognizance. If the ship had landed him on a desert island, from which escape was impossible, or had left him on some remote shore where opportunities of returning to his country rarely occurred, we might justly ascribe to the marine boat the protracted exile, which was its natural and direct consequence. But in this case it is impossible to close our eyes to the fact that the mode in which the libellant was conveyed to the Sandwich Islands in no degree affected willingness to return. The true reason of his omission to do so was the fact that the power of the illegal association which had condemned him to banishment, and denounced death as the penalty of his return, still remained unbroken; and he feared that their threat would be executed if he attempted to disobey their decree. The same result would have followed, had he escaped from their hands while a prisoner, and had they, in his absence, passed a similar sentence against him. It is clear, therefore, that for these wrongs, which were not the acts of the master of the ship, and which were not marine torts, the libellant cannot against this respondent and in this court, recover damages.

It has been suggested that the respondent may have been influenced by humane and just motives. That knowing the only choice presented to the libellant was between death and banishment, he may have reluctantly assisted to carry into effect the latter, in order to save him from the more dreadful alternative. But the facts of the case do not justify this charitable hypothesis. For, in the first place, it is clear that the master of this ship willingly and knowingly made himself and his vessel the instruments whereby the illegal sentence of banishment was carried into execution. And, secondly, it does not appear that if this respondent, and the masters and agents of all other vessels sailing from this port, had been faithful to the laws of their country, and had resolutely refused to allow their ships to be used for the consummation of such great wrongs upon their fellow citizens, more just and humane counsels might not have prevailed with the vigilance committee, and their prisoners be set at liberty. It is at least not clear that they would have been willing to hang those whom they had adjudged to be worthy only of banishment, simply because they found it impossible to execute the milder sentence.

The counsel for the libellant has dwelt with much force on the disgrace and permanent ignoring which the proceedings of the vigilance committee have established upon Gallagher. To have been arrested and imprisoned as a criminal; to have been expelled from society as a pest and a nuisance; to have been transported to a foreign country, never to return, under penalty of death; to be known and published to the world as a vigilance committee exile, whose crimes had rendered his presence incompatible with the safety of a great city,—must, to a man of common sensibility, and of respectable character, constitute an injury, compared with which all ordinary libels, slanders, or other injuries to reputation sink into insignificance. Ample opportunity was afforded at the trial to the counsel for the respondent to show what were the crimes, or what was the character, of the libellant. It would seem from the evidence that up to the period of his arrest his reputation was fair, except that he had been concerned in two fights or riots, the newspaper accounts of which were by one of the witnesses stated to have been grossly exaggerated. No attempt was made to show that on any occasion he had been concerned in frauds at elections, though it was testified by a number of the vigilance committee that he was convicted by that body of being a ballot-box stuffer, of interfering with elections (it is presumed fraudulently), and of general bad conduct. Several respectable witnesses affirm that his reputation was good; that they never heard of his being charged with election frauds, and that they never knew him to have been an inspector or tally clerk at any election. If his character had been so notoriously bad as is represented, the fact could have been shown beyond all doubt; and had his general reputation been that of a person concerned in election frauds, some witness could surely have stated where and at what elections he was reported to have committed them. It is but just to say, that the charge that the libellant's reputation was "notoriously bad"; that he was "always engaged in election rows" and ballot-box stuffing,—is not only unsustained by the evidence as to what his character was, but unsupported by any testimony as to particular acts which might justly have given him that character. But, as has been already observed, for injuries to his character occasioned by the "sentence" of the vigilance committee, this court, in this proceeding, can afford no indemnity; for they cannot properly be said to be the consequence of that portion of the torts committed upon him, of which alone a maritime court has cognizance, viz. his abduction and transportation to a place beyond seas.

But although the respondent cannot in this action be held liable for all the injuries the libellant has sustained, he is nevertheless responsible not only for the marine tort he has committed, but for its natural and nec-

essary consequences. By receiving on board his ship, and transporting to a foreign country, the libellant and his companions he has knowingly assisted in carrying out an alleged sentence, in violation of the most sacred rights of citizens, and has made himself a particeps criminis, so far as the execution of that sentence was concerned. It was not distinctly shown that the respondent was a member of the vigilance committee. It was testified by Carr that he had seen him in their rooms, and no proof was offered to show that he was not a member, —a fact which, if he were not a member, could have been established. But whether a member or not, it is clear that he must have known of their proceedings with regard to the libellant, and he willingly assisted in executing their decree. The libellant was brought on board the vessel to be transported to a foreign country, without money, and destitute of even a change of clothing. In this condition, and with disgrace attaching to him which was the necessary consequence of being put on shore under such circumstances, he was left at Honolulu to gain a subsistence as he could. The respondent must have been fully aware of the sufferings to which a man so landed in a foreign country,—destitute, without friends, with the brand of a criminal upon him, and brought there as a prisoner, unfit to reside in his own home,—must have been exposed; and if he, knowing these results to be the natural and inevitable consequences of the abduction, consented to commit it, the case is very different from that of abducting, or, as it is called, "shanghaiing," a seaman, who at the close of a voyage is left in no worse condition than when he commenced it. It has appeared to me that for a tort of this kind—high-handed and deliberate, in open and contemptuous violation of the hitherto supposed inviolable rights of the citizen—the court should award exemplary damages. It is of the last importance that masters and agents of ships should learn that, whatever be the power that in moments of popular excitement illegal bodies of men may usurp, and for a time exercise, and however important the local laws of a state may temporarily be found, yet, on American vessels on the high seas, the laws of the United States are still supreme; that the power of vigilance committees and similar bodies stop at least with the shore, and that the ocean is not to be the scene, nor American vessels the instruments, for the execution of their decrees.

I shall award to the libellant the sum of $3,000; for which, with costs, a decree must be entered.