**CEH, INC., Plaintiff, Appellee,**

v.

**F/V SEAFARER (ON 675048), et al., Defendants, Appellants.**

**No. 95–1462.**

United States Court of Appeals, First Circuit.

Heard Sept. 6, 1995.

Decided Nov. 28, 1995.

---

Leonard W. Langer with whom Marshall J. Tinkle, Portland, ME, was on brief, for appellants.

Mark A. McSally, Cranston, RI, for appellee.

BOUDIN, Circuit Judge, COFFIN and ALDRICH, Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

Defendant-appellants, the F/V SEAFARER, a fishing trawler, and Michael Doyle and Charles Niles, its owner and captain respectively, appeal the district court's decision after a bench trial finding them liable for the destruction of appellee's lobstering gear and imposing compensatory and punitive damages. *CEH, Inc. v. F/V Seafarer*, 880 F.Supp. 940 (D.R.I.1995). Defendants challenge, *inter alia*, the sufficiency of the evidence, the availability of punitive damages as a matter of law, and the district court's adop-

tion of the *Restatement (Second) of Torts* § 909 as a basis for vicarious liability. We affirm.

## I. BACKGROUND

The facts, as the court found them, are as follows. Plaintiff-appellee CEH, Inc. ("CEH") owns the F/V COURTNEY ELIZABETH, an off-shore lobstering vessel based in Point Judith, Rhode Island. During May and June of 1992, CEH owned 4,200 lobster traps, 2,857 of which were grouped off shore in arrangements referred to as "lobster trawls." A lobster trawl consists of 40 to 55 traps connected to each other by a ground line. Each end of the ground line is attached to a blivet, a cement block that keeps the trawl in place. A rope extends from the top of each blivet to a high flier, a floatable device that consists of ring floats, an aluminum pole and a flag, and which is often marked with radar reflectors. The high fliers mark the location of the lobster traps below.

The COURTNEY ELIZABETH regularly tended to these lobster traps, but between May 13, 1992 and June 7, 1992, she was ashore undergoing repairs. From May 19 to May 23, another vessel hauled and reset the traps. Upon returning to duty on June 7, the crew of the COURTNEY ELIZABETH discovered that 1,093 traps and related equipment were missing. Subsequently, CEH brought this action against defendants, alleging that during two trips between May 23 and June 7, the SEAFARER dragged through CEH's trawls and destroyed 671 traps.[1]

The SEAFARER is a trawler that drags for fish by way of a net extending beyond its stern. During May and June, 1992, the SEAFARER was dragging for monkfish, a fish found near the ocean floor, often in close proximity to high concentrations of lobster. The shared migrations of these species typically cause an overlap in the operating areas of draggers and lobstermen, causing tensions between the two groups. The close quarters result in inevitable gear conflicts, with trawlers often hauling up lobster traps unintentionally. Trawlers generally dispose of damaged, destroyed or abandoned traps ("ghost gear"), but customarily return working traps ("fixed gear") to their owner.

During her first trip, May 23 to May 24, the SEAFARER operated under the direction of Captain Roger Smith, with Charles Niles serving as mate. On May 24, the captain of another lobstering vessel observed the SEAFARER in the area of several of the COURTNEY ELIZABETH's trawls, and, through his wife, informed Timothy Handrigan, the vice-president of CEH, that his lobster trawls were at risk. The next day, Handrigan called Niles in order to advise Niles of the location of his gear. Niles responded that he did not need this information.

Niles captained the second trip of the SEAFARER, from May 28 through June 7, 1992. Also on board were John McKay (mate), and deckhands Phien Hoang, Niles Pearsall and Richard Baker. Except for Baker, who was Captain Niles' nephew, all crewmembers regularly worked on the SEAFARER. On May 29, Captain Robert Buffinton of the F/V EDNA MAE observed the SEAFARER near fixed gear of the COURTNEY ELIZABETH. Upon approaching the SEAFARER, he observed 20 unidentifiable lobster traps on board its deck.

Over the next few days, the SEAFARER hauled up and discarded approximately 200 traps, about 140 of which constituted fixed gear. In addition, the crew cut loose trawl lines that became entangled in the nets of the vessel. In total, the SEAFARER destroyed 134 of CEH's traps.

CEH commenced this action against the ship's owner, Doyle, and the two captains, Niles and Smith, in personam, and the SEAFARER in rem, pursuant to the district court's maritime jurisdiction. *See* 28 U.S.C. § 1333; *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). CEH sought compensatory damages for negligence, and punitive damages for the willful destruction of its property. Following a bench trial, the court

---

1. CEH initially accused defendants of destroying all 1,093 traps, but amended this figure upon discovering that the SEAFARER did not tow in certain regions.

absolved Captain Smith of all liability, but found Niles and the vessel at fault for destroying plaintiff's gear. The court further found that Niles acted in reckless disregard of CEH's property rights by towing through its fixed gear, and that he acted intentionally and maliciously in ordering his crew to cut trawl lines. The court awarded CEH compensatory damages in the amount of $6,759.81 jointly and severally against all parties, punitive damages against Captain Niles in the amount of $10,000, and punitive damages against Michael Doyle in the amount of $50,000.

Defendants attack the legal and factual bases of the court's award. We address these issues seriatim.

## II. SUFFICIENCY OF THE EVIDENCE

■ To establish liability for negligence under general maritime law, CEH needed to prove by a preponderance of the evidence that the SEAFARER destroyed CEH's traps, and that such destruction could have been reasonably avoided. *1st Bank Southeast of Kenosha, Wis. v. M/V Kalidas,* 670 F.Supp. 1421, 1431 (E.D.Wis.1987); *see Burgess v. M/V Tamano,* 564 F.2d 964, 977 (1st Cir.1977).

■ Defendants' core argument is that the evidence fails to demonstrate that the SEAFARER destroyed any of CEH's traps. We review this factual issue in accordance with the "clearly erroneous" standard of Fed. R.Civ.P. 52(a). *DiMillo v. Sheepscot Pilots, Inc.,* 870 F.2d 746, 749 (1st Cir.1989). Unless, after examining the record and according due deference to the trial court, we form a "strong unyielding belief that a mistake has been made," we will adopt the court's findings. *Juno SRL v. S/V Endeavour,* 58 F.3d 1, 4 (1st Cir.1995).

■ The district court determined that the SEAFARER destroyed 134 of CEH's traps and related gear through the following specific findings: the SEAFARER dragged through Trawl 114 (50 wire traps) on May 31, and Trawls 16 (50 wire traps) and 60 (34 A-frame wooden pots) on June 1, 1992. In arriving at these findings, the district court relied on a wealth of circumstantial evidence, all of which is set forth in the district court's opinion, and need not be repeated here in entirety. After scrutinizing this evidence, we conclude that the inferences drawn by the district court were plausible. As such, we affirm the court's findings. *Cumpiano v. Banco Santander Puerto Rico,* 902 F.2d 148, 152 (1st Cir.1990) (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) ("If the district court's account of the evidence is plausible in light of the record reviewed in its entirety, the court of appeals may not reverse it even though convinced that had it had been sitting as the trier of fact, it would have weighed the evidence differently.")).

In light of the factual complexity of this case, we will discuss in some detail the key evidence that supports the court's findings. The court relied primarily on the testimony of crewman Baker, and on a comparison of the logbooks of the SEAFARER and the COURTNEY ELIZABETH.

Baker testified that during the trip: 1) the SEAFARER often operated within 50 to 100 yards of high fliers; 2) a high flier belonging to CEH was towed behind the boat; 3) about 200 traps were brought on deck of the SEAFARER and dumped overboard; 4) approximately 140 of these traps were reusable, and roughly 115 of these belonged to the COURTNEY ELIZABETH; and 5) Baker and other crewmembers regularly cut trawl lines that hung up on the doors of the net. Baker also asserted that after the trip, Charles Niles phoned him in an effort to induce Baker to alter his recollection of the trip.

■ Baker's testimony, taken alone, permits a reasonable inference that the SEAFARER destroyed a number of CEH's traps. In response, defendants argue that each of Baker's assertions is in conflict with the testimony of the other crewmembers and Captain Niles. The district court, however, was within its prerogative to find Baker "wholly credible" while disbelieving the other witnesses. *See Rivera–Gomez v. de Castro,* 900 F.2d 1, 4 (1st Cir.1990).

To pinpoint the dates on which specific trawls were destroyed, the court used the log books of both vessels to plot the course of the SEAFARER against the position of the COURTNEY ELIZABETH's lobster trawls. The court determined that the SEAFARER's path intersected the groundlines of the three trawls on May 31 and June 1.

Defendants contend that inherent inaccuracies in the Loran system and rounding errors in the log books render a comparison of the logs misleading. Their expert, Thomas Bushy, testified that the cumulative effect of all possible errors could cause two separately recorded identical readings to be up to 1.6 nautical miles apart. Nevertheless, on cross examination, Bushy admitted that this figure was the absolute worst case scenario; that, in fact, he did not know whether either vessel's system contained correction factors that would have reduced possible error; and that the locations of the tows and the trawls could have been much closer together. Upon examining the whole of Bushy's testimony, we find no error in the court's plotting of Loran coordinates to reach its specific findings.

Baker's testimony, in conjunction with the court's analysis of the ship logs, provides sufficient evidence to support the court's conclusion that the SEAFARER destroyed Trawls 16, 60 and 114 on May 31 and June 1, 1992. Niles' failure to take any steps to avoid CEH's traps, as demonstrated by his disregard for the presence of high fliers and his rejection of the information offered by Handrigan, establish, at the very least, negligence on his part.

Because the facts set forth above sufficiently support the court's disposition, we need not address defendants' miscellaneous objections to other pieces of circumstantial evidence. In any event, we find them unpersuasive. We uphold the court's finding of negligence and its concomitant award of compensatory damages.

## III. PUNITIVE DAMAGES

The defendants raise four challenges to the award of punitive damages: 1) both Niles and Doyle claim that punitive damages are unavailable as a matter of law in a maritime case; 2) both claim that punitive damages are unjustified by the underlying conduct in this case; 3) Doyle claims that such damages may not be awarded against him through vicarious liability; and 4) both claim that the awards imposed against them are excessive.

### A. Punitive Damages Under General Maritime Law

■ We review *de novo* the district court's determination that punitive damages are recoverable pursuant to plaintiff's general maritime claims. *See In re Extradition of Howard,* 996 F.2d 1320, 1327 (1st Cir.1993).

■ Although rarely imposed, punitive damages have long been recognized as an available remedy in general maritime actions where defendant's intentional or wanton and reckless conduct amounted to a conscious disregard of the rights of others. *See The Amiable Nancy,* 16 U.S. (3 Wheat.) 546, 558, 4 L.Ed. 456 (1818) (criminal trespass); *Muratore v. M/S Scotia Prince,* 845 F.2d 347, 354 (1st Cir.1988) (intentional infliction of emotional distress); *Protectus Alpha Navigation Co. v. North Pacific Grain Growers,* 767 F.2d 1379, 1385 (9th Cir.1985) (destruction of property); *Robinson v. Pocahontas, Inc.,* 477 F.2d 1048, 1051–52 (1st Cir.1973) (willful failure to pay maintenance and cure); *In re Marine Sulphur Queen,* 460 F.2d 89, 105 (2d Cir.1972) (wrongful death); *Pino v. Protection Maritime Ins. Co.,* 490 F.Supp. 277, 281 (D.Mass.1980) (tortious interference with employment rights); *Dredge General,* 1944 A.M.C. 948, 948 (S.D.Fla.1944) (property damage); *The Ludlow,* 280 F. 162, 163 (N.D.Fla.1922) (malicious and unlawful arrest); *The Seven Brothers,* 170 F. 126, 127 (D.R.I.1909) (property damage); *Gallagher v. The Yankee,* 9 F.Cas. 1091, 1093 (N.D.Cal. 1859) (No. 5,196) (unlawful deportation), *aff'd,* 30 F.Cas. 781 (C.C.N.D.Cal.1859) (No. 18,124); *Ralston v. The States Rights,* 20 F.Cas. 201, 209–10 (E.D.Pa.1836) (No. 11,-540) (collision).

■ Nevertheless, in the wake of *Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), courts have been increasingly hesitant to allow punitive damages in certain general maritime actions in-

volving personal injury or death. In *Miles*, the Court held, *inter alia*, that damages recoverable in an action for the wrongful death of a seaman do not include loss of society. *Id.* at 37, 111 S.Ct. at 328. In reaching this conclusion, the Court enunciated principles of uniformity relevant to wrongful death actions, and more broadly, to maritime tort law, which have moved subsequent courts to limit recovery in other similar contexts. Defendants ask us to extend *Miles* to bar recovery of punitive damages in all general maritime cases. However, as described more fully below, we believe *Miles* is inapposite to plaintiff's maritime claim.

In *Miles*, the mother of a deceased seaman brought a wrongful death action sounding both in negligence under the Jones Act, and unseaworthiness under the general maritime law. In denying recovery for loss of society, a form of nonpecuniary relief, the Court ensured a uniform scheme of recovery regardless of whether a wrongful death action was brought under the Death on High Seas Act (DOHSA),[2] the Jones Act[3] or general maritime law.[4] The statutory actions provided only for pecuniary relief: the DOHSA explicitly[5] and the Jones Act implicitly, through its incorporation of the Federal Employers' Liability Act (FELA), which, prior to the enactment of the Jones Act, had been construed to allow only pecuniary relief. *Miles*, 498 U.S. at 32, 111 S.Ct. at 325 (citing *Michigan Cent. R. Co. v. Vreeland*, 227 U.S. 59, 69–71, 33 S.Ct. 192, 196, 57 L.Ed. 417 (1913)). The Court extended this restriction to the unsea-

worthiness claim, explaining that "[i]t would be inconsistent with our place in the constitutional scheme were we to sanction more expansive remedies in a judicially created cause of action in which liability is without fault than Congress has allowed in cases of death resulting from negligence." *Id.* at 33, 111 S.Ct. at 326.[6]

The Court's decision to "restore a uniform rule applicable to all actions for the wrongful death of a seaman," *id.*, logically followed the principle espoused in *Moragne*, 398 U.S. at 401–02, 90 S.Ct. at 1788 (quoting *The Lottawanna*, 88 U.S. (21 Wall.) 558, 575, 22 L.Ed. 654 (1875)), to promote "uniformity [that] not only will further the concerns of both of the 1920 Acts but also will give effect to the constitutionally based principle that federal admiralty law should be 'a system of law coextensive with, and operating uniformly in, the whole country.'" Though these principles of uniformity defy precise limits, we think it clear that the Supreme Court had in mind the need to defer to statutory enactments addressing like issues. As the Court reasoned: "In this era, an admiralty court should look primarily to these legislative enactments for policy guidance.... [and] must be vigilant not to overstep the well-considered boundaries imposed by federal legislation." *Miles*, 498 U.S. at 27, 111 S.Ct. at 322. *Miles*, therefore, does not, as defendants contend, signify a call for universal uniformity of maritime tort remedy, but rather emphasizes the importance of uniformity in the face of applicable legislation.

---

**2.** DOHSA, 46 U.S.C. § 761, authorizes the personal representative of the decedent to bring an action "[w]henever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas."

**3.** The Jones Act, 46 U.S.C. § 688, provides that a seaman injured in the course of employment, or his representative in case of death, may "maintain an action for damages at law ... and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply."

**4.** In *Moragne v. States Marine Lines, Inc.* 398 U.S. 375, 409, 90 S.Ct. 1772, 1792, 26 L.Ed.2d 339 (1970), the Court recognized a wrongful death action under general maritime law. Prior to *Moragne*, plaintiffs not satisfying the require-

ments of DOHSA or the Jones Act had to rely on state wrongful death acts, which, if they existed, varied greatly in nature and scope.

**5.** Recovery under DOSHA is limited to "the pecuniary loss sustained by the persons for whose benefit the suit is brought." 46 U.S.C. § 762.

**6.** A shipowner's breach of the warranty of seaworthiness, a strict liability obligation, *see Miles*, 498 U.S. at 25, 111 S.Ct. at 321, provided a basis of liability under the general maritime law. Therefore, a plaintiff suing for the wrongful death of a seaman could bring a Jones Act claim, which required a showing of negligence, and/or a general maritime unseaworthiness claim, which required no showing of fault. Yet under the unseaworthiness claim, a plaintiff could anticipate, potentially, a much greater recovery than under the Jones Act.

The cases post-*Miles* reflect this focus on relevant legislation. If the factual situation could support an action under either DOHSA or the Jones Act, then nonpecuniary relief is unavailable. *See, e.g., Horsley v. Mobil Oil Corp.,* 15 F.3d 200, 203 (1st Cir.1994) (punitive damages not recoverable in unseaworthiness action for injured seaman); *Miller v. American President Lines, Ltd.,* 989 F.2d 1450, 1459 (6th Cir.1993) (punitive damages not available in unseaworthiness action for the wrongful death of a seaman); *Rollins v. Peterson Builders, Inc.,* 761 F.Supp. 943, 950 (D.R.I.1991) (same).

The import of this legislation in the context of personal injury has led some courts to bar nonpecuniary relief in circumstances addressed by the Jones Act, but involving non-Jones Act plaintiffs and defendants. *See, e.g., Wahlstrom v. Kawasaki Heavy Industries, Ltd.,* 4 F.3d 1084, 1094 (2d Cir.1993) (concluding, based in large part on post-*Miles* authority, that representatives of a deceased *nonseaman* could not recover punitive damages under the general maritime law); *Trahan v. Texaco, Inc.,* 625 So.2d 295, 297 (La.App. 4th Cir.1993) (dismissing a general maritime claim for loss of consortium brought by a seaman's spouse against *nonemployer* third-party defendants); *but see, e.g., Emery v. Rock Island Boatworks,* 847 F.Supp. 114, 117–18 (C.D.Ill.1994) (injured passenger's husband could recover nonpecuniary damages because his claim not cognizable under the Jones Act or DOHSA and, therefore, concerns for uniformity do not exist); *Sugden v. Puget Sound Tug & Barge Co.,* 796 F.Supp. 455, 457 (W.D.Wash.1992) (wife of deceased seaman could recover nonpecuniary damages from non-employer because husband was not a Jones Act seaman for purposes of the suit).

Recently, the Fifth Circuit held that cure and maintenance claims, often considered to lack a statutory counterpart, *see Anderson v. Texaco, Inc.,* 797 F.Supp. 531, 536 (E.D.La. 1992), were, in fact, governed by *Miles. Guevara v. Maritime Overseas Corp.,* 59 F.3d 1496, 1512 (5th Cir.1995) (en banc); *see also Glynn v. Roy Al Boat Management Corp.,* 57 F.3d 1495 (9th Cir.1995).[7] While at first glance, *Guevara* may seem to provide comfort to defendants, a closer reading supports our belief that *Miles* simply is irrelevant here.

*Guevara* followed the approach set forth in *Miles.* First, the court determined whether the factual setting of the case was covered by a statute like the Jones Act or DOHSA. 59 F.3d at 1506. Then, upon finding a statutory/general maritime law overlap,[8] the court invoked the "*Miles* damages uniformity principle" and excluded punitive damages. *Id.* at 1512–13. As the court reasoned, "[i]t makes little sense to create a fragmentation of admiralty law by allowing punitive damages in one class of maintenance and cure cases" while disallowing them in another. *Id.* at 1513.

*Guevara* does not assist defendants in any way. Rather, it merely illustrates, as do the other post-*Miles* cases cited above, that *Miles may* be applicable in those areas of maritime law where, at the very least, there is an overlap between statutory and decisional law. In the instant case, however, there is no legislation whatever that touches upon circumstances involving the reckless or willful destruction of property. Quite simply, Congress has not spoken, and we consequently see no basis under *Miles* for barring nonpecuniary relief here.

■ Defendants' contention that it would be peculiar to provide plaintiffs greater relief for property damage than for personal injury

---

7. *Glynn* and *Guevara* reached identical results through different means. Though concluding that limiting recovery in cure and maintenance claims was consistent with *Miles,* the Ninth Circuit relied primarily on its conclusion that there was no legal support for punitive damages in such cases. 57 F.3d at 1504–05.

8. The Fifth Circuit delineated two types of maintenance and cure actions: one based in tort

involving the deterioration of a seaman's health due to failure to provide maintenance and cure; and one based in contract, not requiring personal injury, but claiming reimbursement for the personal outlay of funds. Even though *Guevara* brought the latter type of claim, because the tort-like action "overlaps with the personal injury coverage of the Jones Act," *id.* at 1511, the court concluded that the legislative scheme affected his recovery.

has some force. The concern expressed in *Miles*, however, was not with respect to an award of nonpecuniary damages in maritime cases in general, but with inconsistency with Congressional pronouncement. *Miles* does not mandate a uniform result for every maritime action and we are hesitant to ascribe to the Court a holding that goes well beyond any issue discussed there. *See United States v. London*, 66 F.3d 1227, 1241 (1st Cir.1995).

In sum, in the absence of any relevant legislation, we think that the uniformity principle enunciated in *Miles* is inapplicable. Therefore, plaintiffs are entitled to forms of relief traditionally available under the general maritime law, including punitive damages. Accordingly, we affirm the district court's determination that punitive damages are recoverable under plaintiff's general maritime claim.

## B. Niles' Conduct

Having held that punitive damages are available, we now address defendants' claim that the district court erred in finding that Niles' conduct warranted them.

▮▮▮ The award of punitive damages is within the sound discretion of the district court. *Muratore*, 845 F.2d at 354. We review the factual findings in support of the award for clear error. *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1349 (9th Cir.1987). And we reiterate that the only circumstances that support an award of punitive damages are "where defendant's actions were intentional, deliberate or so wanton and reckless as to demonstrate a conscious disregard of the rights of others." *Muratore*, 845 F.2d at 354.

The court awarded punitive damages upon finding that Niles acted in reckless disregard for the property rights of CEH in towing through its trawls, and acted intentionally and maliciously in destroying trawl lines and traps. In reaching these conclusions, the district court relied on evidence pertaining to the time before, during and after the conduct in question.

▮▮▮ The testimony indicated that prior to May 1992, apart from the general conflict between lobstermen and trawlers, Niles and the Handrigans had been involved in a dispute over a generator. As a result of this row, Niles, as a matter of custom, refused to return any gear to the COURTNEY ELIZABETH regardless of its condition. Niles also acknowledged that, at the time of the trip, he was aware that the COURTNEY ELIZABETH was laid up undergoing repairs.

Niles' actions during the trip, as reported by Baker, directly support the court's findings. Early on, Niles ordered that "no gear comes home, and all traces of lines and stuff go over board." Later, Niles operated the SEAFARER in close proximity to high fliers, and at one point, dragged a high flier behind the boat. His crewmen cut and disposed of trawl lines that became entangled in the nets of the SEAFARER, and dumped overboard all gear brought on board, including all workable traps. Niles even joked about selling gear back to the owner. After the trip, Niles phoned Baker in an effort to influence Baker to change his story. The district court, quite accurately, characterized Niles' explanation of this call—to get Baker's phone number—as "to say the least foolish, circuitous, and illogical."

Defendants, again, protest that these findings are based solely on Baker's testimony; again, this is of no avail. *See Rivera–Gomez*, 900 F.2d at 4. And, even if defendants are correct that there is inconclusive proof that each line cut or each trap dumped belonged to CEH, the record contains more than enough factual support to demonstrate Niles' willful and malicious conduct toward CEH. Therefore, we affirm the court's award of punitive damages against Niles.

## C. Vicarious Liability

The district court found Doyle liable for punitive damages under the standard enunciated in *Restatement (Second) of Torts* § 909(c),[9] because Doyle delegated "nearly

---

9. Section 909 states:

> Punitive damages can properly be awarded against a master or other principal because of an act by an agent, if but only if,

absolute managerial authority" to Niles. The adoption of the *Restatement* rule as a basis of liability is a question of first impression in this circuit, although we alluded to it in *Muratore*, 845 F.2d at 354–56.

*Muratore* concerned the liability of a ship charterer for the acts of ship photographers that constituted intentional infliction of emotional distress. We discussed three approaches courts have taken when addressing the liability of a principal who neither authorizes nor ratifies her agent's misconduct. Under the majority approach, punitive damages are treated indistinguishably from compensatory ones, and traditional respondeat liability attaches. *Id.* at 354. Principals are held accountable for their agents' misdeeds that occur within the scope of employment. In contrast, a significant minority of courts follow the strict complicity rule of *Lake Shore & M.S.R. Co. v. Prentice*, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1893), which limits principal liability to those acts participated in, authorized or ratified. Finally, the *Restatement* rule incorporates the *Lake Shore* limitation but extends liability, regardless of authorization or ratification, to acts committed by a managerial agent within the scope of employment. 845 F.2d at 355.

In *Muratore*, we declined to follow the majority view, favoring a more limited approach to "ensure that punitive damages are awarded against the guilty offender." *Id.* Further discriminating between the latter two formulations was unnecessary as the plaintiff did not satisfy the requirements of either one. Now, however, our determination of Doyle's liability hinges upon which standard we adopt, because although there is no evidence that Doyle authorized, ratified or participated in the wrongdoing, it is clear that Niles meets the "managerial capacity" criteria.

 We turn first to precedent. In *The Amiable Nancy*, the Supreme Court rejected the imposition of punitive damages against the owners of THE SCOURGE for the privateering acts of her captain and crew because "[the owners] are innocent of the demerit of this transaction, having neither directed it, nor countenanced it, nor participated in it in the slightest degree." 16 U.S. (3 Wheat.) 546, 559, 4 L.Ed. 456 (1818). The requirement of complicity of some sort became further entrenched in *Lake Shore*, where in rejecting a punitive award against a railway for the harassing conduct of its train conductor, the Court stated:

> Exemplary or punitive damages, being awarded, not by way of compensation to the sufferer, but by way of punishment of the offender, and as a warning to others, can only be awarded against one who has participated in the offence. A principal, therefore, though of course liable to make compensation for injuries done by his agent within the scope of his employment, cannot be held liable for exemplary or punitive damages, merely by reason of wanton, oppressive or malicious intent on the part of the agent.

147 U.S. at 107, 13 S.Ct. at 263. Although *Lake Shore* was not an admiralty case, a number of admiralty courts have followed this proposition, rejecting liability absent principal complicity of some sort. *See, e.g., Matter of P & E Boat Rentals, Inc.*, 872 F.2d 642, 652 (5th Cir.1989); *U.S. Steel Corp. v. Fuhrman*, 407 F.2d 1143, 1148 (6th Cir.1969); *Jones v. Compagnie Generale Maritime*, 882 F.Supp. 1079, 1086 (S.D.Ga.1995); *The Seven Brothers*, 170 F. 126, 127 (D.R.I.1909).

In *Fuhrman*, the Sixth Circuit reversed an award of punitive damages against U.S. Steel for the actions of one of its captains who decided to try to beach his holed vessel rather than abandon ship. The court took the position that the captain in good faith used his best judgment, not irrational under the circumstances, "for the benefit of all concerned." 407 F.2d at 1147. Rather than rest on this conclusion, which would make unnecessary any consideration of the vessel

(a) the principal or a managerial agent authorized the doing and the manner of the act, or
(b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or

(c) *the agent was employed in a managerial capacity and was acting in the scope of employment,* or
(d) the principal or a managerial agent of the principal ratified or approved the act. (Emphasis added.)

owner's liability, the court opined that "even if" the captain's actions warranted punitive damages:

> We think the better rule is that punitive damages are not recoverable against the owner of a vessel for the act of the master unless it can be shown that the owner authorized or ratified the acts of the master either before or after the accident. Punitive damages also may be recoverable if the acts complained of were those of an unfit master and the owner was reckless in employing him.

*Id.* at 1148.

The Fifth Circuit followed *Fuhrman* in *Matter of P & E Boat Rentals, Inc.,* 872 F.2d at 652. That case involved multiple wrongful death and personal injury claims brought against Chevron, USA, following a serious collision caused in part by Chevron foremen who directed a charter vessel to operate in extremely foggy conditions. The court observed that the foremen were low level supervisors with no policymaking authority and stated:

> We hold simply that punitive damages may not be imposed against a corporation when one or more of its employees decides on his own to engage in malicious or outrageous conduct. In such a case, the corporation itself cannot be considered the wrongdoer. If the corporation has formulated policies and directed its employees properly, no purpose would be served by imposing punitive damages against it except to increase the amount of the judgment.

*Id.*

In contrast, the Ninth Circuit, in *Protectus Alpha Navigation Co. v. North Pacific Grain Growers, Inc.,* 767 F.2d 1379 (9th Cir.1985), expressly adopted the *Restatement* rule. In that case, North Pacific's dock foreman set adrift a burning vessel in defiance of firemen's orders. This conduct in part caused the destruction of the vessel and the death of a fireman. Because the foreman acted with "reckless or callous disregard" for the rights of Protectus Alpha, and because he was a managerial employee of North Pacific acting in the scope of his employment, the court upheld the imposition of punitive damages against North Pacific. *Id.* at 1385–87.

Justifying its adoption of the *Restatement* rule, the court reasoned:

> We believe the standard of the Restatement better reflects the reality of modern corporate America. We agree that a corporation can act only through its agents and employees, and that no reasonable distinction can be made between the guilt of the employee in a managerial capacity acting within the scope of his employment and the guilt of the corporation. 22 Am.Jur.2d, Damages § 261 (1965). It seems obvious that no corporate executive or director would approve the egregious acts to which punitive damages would attach, and, therefore, no recovery for more than compensatory damages could ever be had against a corporation if express authorization or ratification were always required.

*Id.* at 1386.

In sum, both approaches draw support from precedent. Although the Supreme Court cases cited adopted the strict complicity view, we do not believe the early nineteenth century decision in *The Amiable Nancy* and the late nineteenth, nonadmiralty decision in *Lake Shore* dictate the result here. Neither considered the more modern concerns reflected in the contrary caselaw and, indeed, the Court has indicated that *Lake Shore* may have been unduly restrictive even for its own time. *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 575 n. 14, 102 S.Ct. 1935, 1947 n. 14, 72 L.Ed.2d 330 (1982) ("[T]he Court may have departed from the trend of late 19th–century decisions when it issued *Lake Shore* . . . ."). We note, moreover, that most courts outside the maritime context do not follow *Lake Shore. Id.;* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* 13 (5th ed. 1984). This growing body of precedent is of significance because we discern no reason, and defendants point to none, why vicarious liability should be treated differently on sea than on land. *See Archer v. Trans/American Services,* 834 F.2d 1570, 1573 (11th Cir.1988) ("Federal maritime law embraces the principles of agency."). After

all, *Lake Shore* itself, though repeatedly cited by admiralty courts, was not a maritime case.

After giving both perspectives due consideration, we conclude that strict adherence to the complicity approach would shield a principal, who, though not guilty of direct participation, authorization or ratification in his agent's egregious conduct, nevertheless shares blame for the wrongdoing. Therefore, we believe that some features of the *Restatement* approach are helpful here. In our view, imposing vicarious liability on a principal for the act of an agent employed in a managerial capacity and acting in the scope of employment represents an appropriate evolution of the *Lake Shore* rule, at least when linked to requiring some level of culpability for the misconduct.

Our approach today falls short of wholesale adoption of the *Restatement* because section 909(c), read literally, could impose liability in circumstances that do not demonstrate any fault on the part of the principal. Because this is not such a case, however, we need not resolve whether the *Restatement*'s vicarious liability principle would in fact reach so far.

■ Whatever the outer parameters of "managerial capacity" liability may be, the district court supportably found that the circumstances here justified the imposition of punitive damages against Doyle. In so concluding, the district court discussed at some length the intertwined issues of Niles' managerial authority and Doyle's culpability in failing to supervise Niles. Niles had total authority to hire and fire the crew, to determine the duration, location and targets of the trips, and to sell the catch wherever he chose. In short, Niles had "complete managerial discretion over the means and methods of fishing." Niles set forth and implemented whatever policy, if any, the crew of the SEA-FARER followed. Moreover, the decisions made by Niles directly affected the success of Doyle's fishing business.

This delegation of complete managerial discretion was made notwithstanding Doyle's knowledge that "he had hired his captains to work in an atmosphere characterized in part by the tension that raged between lobstermen and draggers." Not only was there a complete delegation of authority in a troublesome work situation, but also a complete absence of any policy directive, written or oral, regarding the operation of Doyle's vessels in lobster trawl areas. This combination of circumstances places this case well within the sphere of culpability.[10]

As applied here, the imposition of punitive damages, in the district court's words, "encourages shipowners to hire qualified and responsible captains and to exercise supervisory power over them." In addition, it fairly punishes Doyle for his failure to provide any supervision over his captains. In short, therefore, the district court's award properly serves the purposes of punitive damages: "to punish defendant and to deter others from engaging in like manner." *Muratore*, 845 F.2d at 354. Accordingly, we affirm the award of punitive damages against Doyle.

## D. The Amount of the Awards

Finally, we address defendants' arguments that the amounts awarded in punitive damages were excessive and in error. The court assessed punitive damages against Niles for $10,000 and Doyle for $50,000.

■ We begin by stating two basic propositions. First, we review the district court's determination of the correct amount of punitive damages for clear error. *See American Title Ins. Co. v. East West Financial*, 16 F.3d 449, 461 (1st Cir.1994). Second, punitive damages are solely intended to serve the purposes of punishment and deterrence, and should not provide plaintiff with a windfall. *Aldrich v. Thomson McKinnon Sec., Inc.*, 756 F.2d 243, 249 (2d Cir.1985); *Ramsey v. American Air Filter Co.*, 772 F.2d

---

**10.** In addition, these factors further distinguish *Matter of P & E Boat Rentals* and *Fuhrman*. In the former case, as indicated earlier, the Fifth Circuit rejected vicarious liability in part because the "corporation ha[d] formulated policies." 872 F.2d at 652. In the latter, the Sixth Circuit, upon considering the unique emergency circumstances involved, concluded that the captain had "the responsibility to make the final decision as to what the proper course of action must be in view of all of the factors concerned." 407 F.2d at 1147. Here, in contrast, Niles' misconduct occurred during the regular course of operations, an area where the owner could have and should have set policy.

1303, 1314 (7th Cir.1985). Taken together, we will not disturb an award of punitive damages unless we are certain that it is greater than reasonably necessary to punish and deter. *See Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 21–22, 111 S.Ct. 1032, 1045–46, 113 L.Ed.2d 1 (1991); *Vasbinder v. Scott,* 976 F.2d 118, 121 (2nd Cir.1992) (quoting *Haslip,* 499 U.S. at 21, 111 S.Ct. at 1045) ("Thus, the function of appellate review of punitive damages is to make 'certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.' ").

The Supreme Court has rejected a "mathematical bright line" approach to the award of punitive damages. *Haslip,* 499 U.S. at 18, 111 S.Ct. at 1043; *TXO Production Corp. v. Alliance Resources Corp.,* ―― U.S. ――, ――, 113 S.Ct. 2711, 2721, 125 L.Ed.2d 366 (1993) (rejecting "an approach that concentrates entirely on the relationship between actual and punitive damages"). Instead, the Court has indicated that an award should be reasonable in light of various considerations, such as the magnitude of harm caused or potentially caused and the net worth of the defendant. *See TXO,* ―― U.S. at ―― & n. 28, 113 S.Ct. at 2722 & n. 28. Contrary to defendants' exhortations, there is no general rule defining the maximum proportion of net worth that may be exacted. However, an award should not result in the defendant's financial ruin. *Vasbinder,* 976 F.2d at 121; *Arceneaux v. Merrill Lynch, Pierce, F. & S.,* 767 F.2d 1498, 1503 (11th Cir.1985).

Having set forth these basic considerations, we address each award in turn. The assessment of $10,000 against Niles constitutes approximately 55% of his net worth of $18,250. Undoubtedly, this award will cause financial hardship. Nonetheless, we are satisfied that the district court carefully considered Niles' financial status when fashioning this punishment. We cannot hold as a matter of law that the award exceeds an amount appropriate for punishment and deterrence, particularly in light of Niles' willful misconduct in destroying CEH's property and in attempting to conceal that misconduct. Therefore, we affirm the amount of Niles' award.

In light of Doyle's higher net worth, the court awarded punitive damages against him in the amount of $50,000. Doyle argues that it is "fundamentally unjust" to punish a principal who did not commit the misconduct at a higher level than the actual perpetrator. Notwithstanding the difference in amount, we note that, in terms of net worth, Doyle's punishment is proportionately much less than Niles'. Moreover, it is axiomatic that any theory of vicarious liability will inevitably involve charging liability upon a less directly involved principal. Additionally, the consideration of Doyle's net worth is integral to the objectives of punitive damages: it ensures that the award is neither too severe nor too trivial.

We cannot, therefore, conclude as a matter of law that a $50,000 award here is clearly erroneous. We affirm the award imposed against Doyle.

*Affirmed.*